## McFADDEN v. MOUNTAIN VIEW MIN. & MILL. CO.

(Circuit Court of Appeals, Ninth Circuit. September 11, 1899.)

### No. 482.

1. APPEAL—CITATION IN ERROR—WAIVER OF IRREGULARITY.

Under rule 36 of the circuit court of appeals for the Ninth circuit (31 C. C. A. cxli., 90 Fed. cxli.), providing for the holding of a term of the court at Seattle in September of each year, and that all appeals and writs of error from the circuit and district courts for the district of Washington shall be heard at the Seattle term unless it is stipulated by the parties thereto that they be heard at San Francisco, the making of a citation in error, issued in September, after the holding of the Seattle term, returnable at San Francisco, is at most a mere irregularity, which is waived by a stipulation of counsel that the cause be heard at San Francisco.

2. SAME—METHOD OF TAKING CASE UP FOR REVIEW.

In an action brought under Rev. St. § 2326, for an adjudication of contested mining claims, there having been conflicting decisions as to whether such suits were at law or in equity, the defeated party is justified in taking the case up for review both by appeal and writ of error, to guard against a possible dismissal.

3. JURISDICTION OF FEDERAL COURTS—SUIT TO DETERMINE CONTEST BETWEEN MINING CLAIMS.

A federal court has jurisdiction of a suit brought under Rev. St. § 2326, to determine a contest between mining claims, where the alleged value of the property meets the statutory requirements.

4. MINERAL LANDS—SUIT TO DETERMINE CONTEST BETWEEN MINING CLAIMS.

A suit brought under Rev. St. § 2326, to determine a contest between mining claims is of an equitable nature.

5. PUBLIC LANDS—CONSTRUCTION OF STATUTE—EFFECT OF CONSTRUCTION BY LAND DEPARTMENT.

The construction placed on an act of congress relating to public lands by the land department, charged with its execution, especially where it is followed uniformly for a number of years, is entitled to great weight, and should not be overthrown except for cogent reasons, and unless it is clearly erroneous.

6. SAME—ACT RESTORING INDIAN RESERVATION—MINING LOCATIONS.

Act July 1, 1892 (27 Stat. 62), restoring to the public domain a portion of the Colville Indian reservation in the state of Washington, and providing that, subject to the right of individual allotments therefrom to Indians as prescribed therein, the same should be open to settlement and entry by the proclamation of the president, and should be disposed of under the general laws, did not operate of itself, in advance of the proclamation of the president, to give a right to locate mining claims therein under the mineral laws, a contrary construction having been placed upon it by the land department, and also, in effect, by congress, by the passage subsequently of Act Feb. 20, 1896, in terms extending the mineral land laws so as to apply to the lands described in the prior act.

Gilbert, Circuit Judge, dissenting.

In Error to and Appeal from the Circuit Court of the United States for the Eastern Division of the District of Washington.

Stoll & Macdonald and Albert Allen, for plaintiff in error and appellant.

W. B. Heyburn, for defendant in error and appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.  This action was commenced in the superior court of the state of Washington for the county of Stevens for the purpose of securing an adjudication by a court of competent jurisdiction of the adverse claims of the parties to certain mining ground under and by virtue of the provisions of section 2326 of the Revised Statutes of the United States; the plaintiff in the action claiming under locations thereof made on the 20th day of February, 1896, and the defendant under a location as the "Mountain View' Claim," made on the 16th day of October, 1895.  On the motion of the defendant, the action was removed into the circuit court of the United States for the district of Washington, Eastern division.  In that court the respective parties entered into written stipulations, waiving a jury, and submitting the case to the court upon an agreed statement of facts, which in express terms eliminated every question from the consideration of the court except one, viz. whether or not, at the time of the location of the Mountain View claim, or at any time prior to the 20th day of February, 1896, that portion of the Colville Indian reservation within which the ground in question is situated was open to the location of mining claims.  In the court below judgment was given for the defendant to the action.  87 Fed. 154.  That court having treated the case as an action at law, the plaintiff in the suit, out of an abundance of caution, not only appealed from the judgment, but also sued out a writ of error.  This fact constitutes one of the grounds of the motion made on behalf of the defendant to the suit to dismiss both the appeal and the writ of error.  The other ground of the motion is that in and by the citations appearing in the record the appellee and defendant in error is cited to appear, within 30 days from the date of the issuance of the writs, in this court, at the city of San Francisco, Cal., instead of at the city of Seattle, in the state of Washington.

There is no merit in either of these grounds.  The latter ground of the motion to dismiss is based upon the third subdivision of rule 36 of this court (31 C. C. A. cxli., 90 Fed. cxli.), providing for the holding of a term of the court in the city of Seattle, in the state of Washington, beginning on the second Monday in September, and also a term each year at the city of Portland, in the state of Oregon, beginning on the third Monday in September; and providing, also, that "all appeals and writs of error from the circuit and district courts for the district of Washington shall be heard at said annual term in the city of Seattle, unless it is stipulated by the parties thereto that they be heard at San Francisco."  The citations were issued on the 26th day of September, 1898, and, as no term of the court would be held in Seattle until about one year thereafter, they

were made returnable at the city of San Francisco, at which place the next term of the court after the return day of the writs would be held. In view of these facts it may well be doubted whether the citations were not properly made returnable at the city of San Francisco. On the return day of the writs the court was to be in session at that place, and under the rules of the court the parties were permitted to stipulate for the cause being heard there. The defect, if defect at all, was a mere irregularity, which might be, and which was in this case, waived by the moving party; for the record shows that, not only did its counsel acknowledge service of a copy of each of the citations, and due service of the brief of the plaintiff in error and appellant, without objection, but on the 12th day of November, 1898, entered into a stipulation in writing with the counsel for the plaintiff in error and appellant to the effect that the cause be heard at San Francisco at the then next session of the court, instead of at the city of Seattle. The office of the citation is to give notice to the opposite party of the removal of the cause to the appellate court. The supreme court, in Bigler v. Waller, 12 Wall. 142, said:

"Notice is required by law; and where none is given, and the failure to comply with the requirement is not waived, the appeal or writ of error must be dismissed; but the defect may be waived in various ways,—as, by the consent or appearance or the fraud of the other party. Service of the citation may be made upon the attorney of record of the proper party. Bacon v. Hart, 1 Black, 38. Unquestionably, the attorney of record may also waive service, and acknowledge notice on the citation, and in that behalf he represents the party. Grosvenor v. Danforth, 16 Mass. 74; Adams v. Robinson, 1 Pick. 461."

Referring to the facts in that case, the court continued:

"On the citation in this case is the following indorsement: 'I hereby acknowledge service of the within citation. James Alfred Jones, Counsel for Defendants in this Case in the Circuit Court of the United States of the District of Virginia.' Viewed in any reasonable light, it seems to the court that the attorney knew that the appeal was allowed by the court, and was prosecuted by the appellant, which is the only purpose intended to be effected by the citation. Having been counsel in the case, the party signing that certificate must have known that the suit had been revived, and that proceeding took place before the final decree was entered. Such a service would be sufficient beyond all doubt if there had been no error in the form of the citation, and, as that objection is a merely formal one, we are all of the opinion that it must be considered as waived by the circumstantial language of the certificate signed without objection by the attorney of record in the circuit court."

To the same effect is Tripp v. Railroad Co., 144 U. S. 126, 129, 12 Sup. Ct. 655; Villabolos v. U. S., 6 How. 81, 90; Goodwin v. Fox, 120 U. S. 775, 7 Sup. Ct. 779.

As there have been conflicting decisions of the courts in respect to the character of the action brought in the court below by the plaintiff in error and appellant, he, out of abundant caution, and to guard against a possible chance of dismissal, brought the case here both by appeal and by writ of error. There was, however, but one action in the court below, and but one cause and one record here. The method pursued was the safe one, and has the sanction of the supreme court. Hurst v. Hollingsworth, 94 U. S. 111, 100 U. S. 100; Plymouth Consol. Gold-Min. Co. v. Amador & S. Canal Co., 118 U. S. 264, 269, 6 Sup. Ct. 1034. As the record, however, shows that the action was brought under and by virtue of the pro-

visions of section 2326 of the Revised Statutes, for the adjudication of a contest originating in the land office of the United States, the same question of jurisdiction that was determined by this court in the case of Mining Co. v. Rutter, 31 C. C. A. 223, 87 Fed. 801, is presented. In that case this court, after full consideration, held, in accordance with the rulings of several of the circuit courts of this circuit, as well as of others, that of such an action, where, as here, the alleged value of the property in controversy is sufficient to answer the statutory requirement in that regard, the federal courts have full jurisdiction, and, furthermore, that such an action is of an equitable nature. We adhere to that decision, and deny the motions to dismiss.

The merits of the case are, by the agreement of the respective parties, made to turn upon the question whether or not the ground in controversy was subject to location as a mining claim or claims on the 16th day of October, 1895, when it was located as the "Mountain View Claim" by the grantor of the appellee. If the ground was then subject to such location, it is agreed by the respective parties that the judgment of the court below should be affirmed, since it is stipulated that the location under which the appellee claims was made in compliance with the law, if the ground was then subject to be located under the mining laws. If it was not so subject, it is conceded by the respective parties that the judgment of the court below must be reversed, as it is further agreed that in that event the locations under which the appellant claims are valid. By the act of July 4, 1866 (14 Stat 86), and subsequent acts, congress provided, among other things, that in all cases lands valuable for minerals shall be reserved from sale, except as otherwise directed by law; and further declared that all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States, and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable, and not inconsistent with the laws of the United States. Rev. St. §§ 2318, 2319. On the 9th day of April, 1872, an executive order was issued by President Grant, by which was set apart as a reservation for certain specified Indians, and for such other Indians as the department of the interior should see fit to locate thereon, a certain scope of country "bounded on the east and south by the Columbia river, on the west by the Okanagon river, and on the north by the British possessions," thereafter known as the "Colville Indian Reservation." There can be no doubt of the power of the president to reserve those lands of the United States for the use of the Indians. The effect of that executive order was the same as would have been a treaty with the Indians for the same purpose, and was to exclude all intrusion upon the territory thus reserved by any and every person, other than the Indians for whose benefit the reservation was made, for mining as well as other purposes. Kendall v. Mining Co., 144 U. S. 658, 663, 12 Sup. Ct. 779.

That reservation stood unrevoked for many years, and it is not pretended that during that time anybody had any right to locate thereon any mining claim, or otherwise acquire any right to any portion thereof from the government. On the 19th day of August, 1890, congress, by an act of that date (26 Stat. 355), authorized the president to appoint a commission composed of three persons to visit the Colville Indian reservation, and negotiate with the Indians for the cession of such portion thereof as they might be willing to dispose of, and directing the commission to report to the secretary of the interior, and that officer to report the facts to congress. In pursuance of that act, the president appointed a commission consisting of three persons to carry on the proposed negotiations, which commission made its report to the secretary of the interior on June 8, 1891, which was transmitted to congress by the president in a message of date June 6, 1892. The report contains, among other things, this statement:

"That of the portion of the territory ceded it is estimated that about three hundred thousand acres are suitable for agricultural purposes. The remainder is very valuable for grazing purposes and for the timber thereon. Much of the territory ceded is mountainous, and abounds in rich mineral deposits. The southern portion of said reservation—it being the portion of said reservation not ceded—contains the largest proportion of agricultural lands, and the grazing lands upon this portion are, for the most part, fine. The supply of timber here is quite ample. From the best information the commission has been able to obtain, it is believed that there is upon the portion of said reservation not ceded an acreage of land suitable for agricultural purposes very largely in excess of a hundred and sixty thousand acres, the limitation indicated in department instructions dated October 21, 1891. The commission did not deem it advisable to negotiate with the Indians for the purchase of any greater area of territory than that ceded, and are satisfied that the portion of said reservation not ceded contains ample territory for the comfort, security, support, and maintenance of all the Indians upon said reservation in their various avocations of life. From the best information the commission could obtain without incurring the expense of a survey,— and this was not practicable, owing to the scarcity of funds,—there remain of the portion of the Colville reservation not ceded near one million three hundred thousand acres."

The commission negotiated a treaty with the Indians providing for the extinguishment of all of their rights and claims in and to the north half of the reservation in question, which treaty was to become effective upon its approval by congress. The treaty was submitted to congress, and also a proposed bill for enactment to carry the treaty into effect. The message, with the report of the commission and agreement, was, by the house of representatives, referred to its committee on Indian affairs, which reported that the necessity for opening at least a portion of the reservation existed for these, among other, reasons:

"A lessening of the dimensions of the Colville reservation, the planting of active, prosperous, and well-ordered white communities on every side of the Indians, the building of railroads, the creation of towns and cities, the opening of mines, and the consequent establishment of markets near at hand, etc. Further, that the reservation is surrounded on two sides by the Columbia river, on one side by the wilds of British Columbia, and on the other by a portion of Washington that has no outlet by rail, because the reservation itself stands as a barrier to all railroad construction from the east. And, as a third reason why the reservation should be opened, that the reservation, as it

stands to-day, is a great obstacle to the development of the state of Washington, and the general progress of the Pacific Northwest. So long as it continues to be the sporting ground of so sparse, thriftless, and irresponsible a population, its lands will remain untilled, and its mines will remain unopened, being more than the Indians need for sustenance and comfort, yielding no revenue to the general government, and being of no taxable value to the state of which it is an inseparable and essential part. It cuts off communication between the eastern and western portion of the state, and blocks the way to railroads that stand waiting at its boundaries. A railroad company—a local corporation—has constructed a line from the city of Spokane, the metropolis of Eastern Washington, to Marcus, a point on the Columbia river, 100 miles distant, at an expense of over two million dollars, and has surveyed an extension through the reservation to the Okanagon country, an extensive region between the Colville reservation and the Cascade Mountains, rich in mineral and agricultural products, but wholly without railroad transportation," etc.

The bill upon which this report was made was entitled "An act to ratify and confirm an agreement with the Indians residing on the Colville reservation, in the state of Washington, with certain modifications, and making appropriation for carrying into effect the same." This was house bill No. 7,557, introduced in the house and referred to the committee of the whole on April 9, 1892. The bill to carry into effect the proposed treaty with the Indians was not enacted, but congress did enact. on the 1st day of July, 1892, an act, the proper construction of which must control the disposition of the present case. That act is entitled "An act to provide for the opening of a part of the Colville reservation in the state of Washington, and for other purposes," and by its first section provides:

"That subject to the reservations and allotments of lands in severalty to the individual members of the Indians of the Colville reservation in the state of Washington herein provided for, all the following described tract or portion of said Colville reservation, namely: Beginning at a point on the eastern boundary line of the Colville Indian reservation where the township line between townships thirty-four and thirty-five north, of range thirty-seven east, of the Willamette meridian, if extended west, would intersect the same, said point being in the middle of the channel of the Columbia river, and running thence west parallel with the forty-ninth parallel of latitude to the western boundary line of the said Colville Indian reservation in the Okanagon river, thence north following the said western boundary line to the said forty-ninth parallel of latitude, thence east along the said forty-ninth parallel of latitude to the northeast corner of the said Colville Indian reservation, thence south following the eastern boundary of said reservation to the place of beginning, containing by estimation one million five hundred thousand acres, the same being a portion of the Colville Indian reservation created by executive order dated July second, eighteen hundred and seventy-two, be, and is hereby, vacated and restored to the public domain, notwithstanding any executive order or other proceeding whereby the same was set apart as a reservation for any Indians or bands of Indians, and the same shall be open to settlement and entry by the proclamation of the president of the United States and shall be disposed of under the general laws applicable to the disposition of public lands in the state of Washington." 27 Stat. 62.

Section 2 of this act provides for the disposition of the lands to be so opened to settlement, entry, and disposition. By section 3 it is provided that each entryman under the homestead laws shall within five years from the date of his original entry, before receiving a final certificate of the land covered by his entry, pay to the United States for the land so taken by him, in addition to the fees provided by law, the sum of $1.50 per acre, one-third of which shall be paid

within two years after the date of the original entry; but that the rights of honorably discharged Union soldiers and sailors, as defined in certain specified sections of the Revised Statutes, shall not be abridged except as to the sum to be paid as aforesaid. Section 4 is as follows:

"That each and every Indian now residing upon the portion of the Colville Indian reservation hereby vacated and restored to the public domain, and who is so entitled to reside thereon, shall be entitled to select from said vacated portion eighty acres of land, which shall be allotted to each Indian in severalty. No restrictions as to locality shall be placed upon such selections other than that they shall be so located as to conform to the congressional survey or subdivisions of said tract or country, and any Indian having improvements may have the preference over any other person in and to the tract of land containing such improvements, so far as they are within a legal subdivision not exceeding in area the quantity of land that he or she may be entitled to select and locate. All such allotments shall be made at the cost of the United States, under such rules and regulations as the secretary of the interior may from time to time prescribe. Such selections shall be made within six months after the date of the president's proclamation opening the lands hereby vacated to settlement and entry, and after the same have been surveyed, and when such allotments have been selected as aforesaid, and approved by the secretary of the interior, the titles thereto shall be held in trust for the benefit of the allottees respectively, and afterwards conveyed in fee simple to the allottees, or their heirs, as provided in the act of congress entitled 'An act to provide for the allotment of land in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and territories over the Indians, and for other purposes,' approved February eighth, eighteen hundred and eighty-seven, and an act in amendment and extension thereof, approved February twenty-eighth, eighteen hundred and ninety-one, entitled, 'An act to amend and further extend the benefits of the act approved February eighth, eighteen hundred and eighty-seven, entitled "An act to provide for the allotment of land in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States over the Indians, and for other purposes"': provided, that such allotted lands shall be subject to the laws of eminent domain of the state of Washington, and shall, when conveyed in fee simple to the allottees or their heirs, be subject to taxation as other property in said state."

By section 5 it is provided that all Indians residing on the lands by the act vacated and restored shall have the right, if they so prefer, under the direction of the Indian agent, to occupy and reside upon such portions of the Colville Indian reservation not by the act vacated as are not occupied by or in the possession of any other Indian or Indians. Section 6 of the act makes provisions for land for school purposes, and also for a site for certain mills, and, after making an appropriation for the purpose of carrying out the provisions of the act, it concludes by declaring in section 8 that nothing contained in the act shall be considered as recognizing title or ownership by the Indians of any part of the reservation, whether restored to the public domain or still reserved by the government for their use and occupancy. On the 20th day of February, 1896, congress passed an act entitled "An act to extend the mineral-land laws of the United States to lands embraced in the north half of the Colville Indian reservation," by which it is declared "that the mineral-land laws of the United States be, and are hereby, extended so as to apply to all lands" described in section 1 of the above act of July 1, 1892 (29 Stat. 9). On the 6th day of March, 1896, congress passed

an act entitled "An act granting to the Columbia and Red Mountain Railway Company a right of way through the Colville Indian reservation, in the state of Washington, and for other purposes," and providing:

"That there be, and is hereby, granted to the Columbia and Red Mountain Railway Company, a corporation organized under the laws of the state of Washington, a right of way to the extent of one hundred feet on each side of the center line of said railway across the Colville Indian reservation in the state of Washington, commencing at a point at or near the Little Dalles on the Columbia river, in Stevens county in said state, and running thence in a northerly direction by the most feasible route to the international boundary line between the United States and British Columbia, together with all the rights granted to railroads by the act of congress entitled 'An act granting to railroads a right of way through the public lands of the United States,' approved March third, eighteen hundred and seventy-five; and for the purposes of this grant, and the construction of said railway, all the provisions of said act are hereby declared to be applicable thereto to the same extent as though the lands in said reservation were open to settlement and sale." 29 Stat. 44.

The question in the case is whether or not the act of July 1, 1892, in and of itself operated to restore that portion of the Colville Indian reservation described in its first section to the mass of public lands, so as to admit of the immediate entry thereon by the public, and the location of mining claims upon it under the mining laws of the United States; for it cannot be doubted that, if one man was thereby given the right of entry thereon for the purpose of prospecting and locating mining claims, every citizen of the United States, and every person who had declared his intention to become such, was thereby given the same right. It is undisputed that the officers of the land department have uniformly held that the act did not have that effect. Indeed, the secretary of the interior, when advised that many persons had gone upon that portion of the reservation for the purpose of making mining locations and entries, issued, by direction of the president, a warning to such persons, prohibiting them from going upon the reservation for any purpose in advance of the issuance of the proclamation by the president provided for by the act. It is said in support of the judgment given below that where the words of an act of congress are plain, and their meaning is clear, they must prevail, notwithstanding they have been otherwise construed by the officers charged with the execution of the law. That is perfectly true, but at the same time the rule is firmly established that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overthrown except for cogent reasons, and unless it be clear that such construction is erroneous. U. S. v. Johnston, 124 U. S. 236, 253, 8 Sup. Ct. 446; Edwards v. Darby, 12 Wheat. 206; U. S. v. Moore, 95 U. S. 760; Hahn v. U. S., 107 U. S. 402, 2 Sup. Ct. 494; U. S. v. Philbrick, 120 U. S. 52, 59, 7 Sup. Ct. 413; Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739. Moreover, the legislative construction of its own act is always potent. "If it can be gathered," said the supreme court in U. S. v. Freeman, 3 How. 556, 564, "from a subsequent statute in pari materia, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of

its meaning, and will govern the construction of the first statute." And in the case of Philadelphia & E. R. Co. v. Catawissa R. Co., 53 Pa. St. 20, the supreme court of Pennsylvania said:

"If a contemporaneous construction by the legislature of the same words can be discovered, it is high evidence of the sense intended."

That the acts of July 1, 1892, and February 20, 1896, are in pari materia, is perfectly plain, for they relate to the same subject-matter, and are parts of the same legislative purpose. In respect to such statutes, Sutherland (St. Const. § 283) says:

"All consistent statutes which can stand together, though enacted at different dates, relating to the same subject, and hence briefly called statutes in pari materia, are treated prospectively, and construed together, as though they constituted one act. This is true whether the acts relating to the same subject were passed at different dates, separated by long or short intervals at the same session, or on the same day. They are all to be compared; harmonized, if possible; and, if not susceptible to a construction which will make all of their provisions harmonize, they are made to operate together, so far as possible, consistently with the evident intent of the latest enactment."

And in Endlich on the Interpretation of Statutes, at section 43, it is said:

"Where there are earlier acts relating to the same subject, the survey must extend to them, for all are, for the purposes of construction, considered as forming one homogeneous and consistent body of law, and each of which may explain and elucidate every other part of the common system to which it belongs."

That congress did not intend by the act of July 1, 1892, to open the portion of the Colville Indian reservation thereby restored to the public domain to the operation of the mineral laws of the United States in advance of and without reference to the proclamation of the president therein provided for, is, we think, quite clearly shown by its act of February 20, 1896, in which, as has been seen, it declared "that the mineral land laws of the United States be, and are hereby, extended so as to apply to all lands" described in section 1 of the act of July 1, 1892. If, by the act of July 1, 1892, congress had already brought those lands within the operation of the mineral land laws, there was obviously no need of the act of February 20, 1896, providing, as it did, for precisely the same thing. Idle acts cannot be justly or properly attributed to congress. To the suggestion that the officers of the land department of the government had uniformly held that the act of July 1, 1892, did not open the portion of the reservation restored to the public domain to the operation of the mineral laws in advance of the president's proclamation, and that for that reason congress passed the act of February 20, 1896, the answer is that there is in the language of the latter act no indication whatever of any intention on the part of congress to correct the interpretation that had been put by the officers of the land department upon its previous act of July 1, 1892. If such had been the intention, it could very easily have been expressed, and some expression indicating the intention would very naturally be expected. On the contrary, the language of the act of 1896 is "that the mineral land laws of the United States be, and are hereby, extended so as to apply" to the lands restored to the public domain

by the act of July 1, 1892. The words of the act of 1896 that there "be and are hereby extended," etc., are words of present and future operation, and do not manifest any intent on the part of congress to give to the act in which they appear a retrospective effect, but do clearly indicate that congress did not consider that the lands in question were already within the operation of the mining laws. Retrospective effect is never given to a law unless the language used, properly construed, plainly manifests such intention. Endl. Interp. St. §§ 291–294; Potter's Dwar. St. pp. 60, 70, note. See, also, U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389; Schulenberg v. Harriman, 21 Wall. 44.

Recurring to the act of July 1, 1892, we see no good reason to doubt that it was properly construed by the officers of the land department, and by congress itself, as manifested by its act of February 20, 1896. It is true that by the first section of the act of July 1, 1892, that portion of the Colville Indian reservation therein described was, with certain limitations and exceptions, restored to the public domain; but it must be remembered that all of the public domain is not subject to entry or disposal under the mining or other general laws of the United States. Alaska became a part of the public domain of the United States upon its cession by the emperor of Russia; but it was not until July 27, 1868, that the laws of the United States relating to customs, commerce, and navigation were extended to and over that portion of the public domain (15 Stat. 240), and not until March 17, 1884, that the laws of the United States relating to mining claims, and the rights incident thereto, were made applicable thereto, and then only subject to certain conditions and provisions prescribed by congress. 23 Stat. 24. Later, a further extension of the general land laws of the United States were made to Alaska. Act March 3, 1891 (26 Stat. 1095). The public lands of Hawaii, Porto Rico, and other recently acquired territory now constitute a part of the public domain of the United States, but to none of these has congress yet extended the mining or any of the other general land laws of the United States. All of this is the province, and the exclusive province, of the legislative department of the government. It does not, therefore, necessarily follow, from the mere fact that certain territory constitutes a part of the public domain, that the mining laws of the United States apply thereto. They do if congress has so provided, but they do not unless congress has so provided.

Again recurring to the act of July 1, 1892, it is seen that the portion of the Colville Indian reservation thereby restored to the public domain was expressly made subject to the reservations and allotments of lands in severalty to the individual members of the Colville tribe provided for in the act, and the restoration was also accompanied with the express statutory declaration that the portion restored "shall be opened to settlement and entry by the proclamation of the president of the United States, and shall be disposed of under the general laws applicable to the disposition of public lands in the state of Washington." From these provisions it is plain, we

think, that the "opening" to be effected by the president's proclama-
tion was as broad as the "disposition" provided for by the same sec-
tion and clause; that is to say, that the lands authorized by the act
to be disposed of under the general laws applicable to the disposi-
tion of the public lands were the same lands, and none other, that
the president was, by his proclamation, authorized to open to settle-
ment and entry. The general laws applicable to the disposition of
the public lands embrace those relating to mining claims, as well
as those relating to pre-emption, homestead, and other entries. "The
words 'public lands,'" said the supreme court in Newhall v. Sanger,
92 U. S. 763, "are habitually used in our legislation to describe such
as are subject to sale or other disposal under general laws." See, .
also, Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856; Mann
v. Land Co., 153 U. S. 273, 14 Sup. Ct. 820; Doolan v. Carr, 125 U.
S. 618, 8 Sup. Ct. 1228. While it is true that the right to mineral
lands is initiated by location, after the proper discovery of mineral
thereon, and that such claims may be held and worked without pur-
chase, yet the law authorizing their exploration also provides for
their location, entry, and purchase. Rev. St. §§ 2319–2350. It neces-
sarily follows that any of the lands of the United States that are
by its general laws, open to exploration for minerals are likewise
open to location, entry, and purchase as such, if they be mineral in
character, and mineral be discovered therein. Hence it cannot be
true, we think, that the portion of the Colville reservation restored
to the public domain by the act of July 1, 1892, was any more open
to the public in the exploration of minerals and the location of min-
ing claims thereon, in advance of the proclamation of the president
therein provided for, than it was to any other kind of entry, or
settlement, or disposition. Such exploration, if generally carried
on, might, and very probably would, have resulted in numerous loca-
tions, very likely interfering with the allotments to the Indians pro-
vided for by the act, and subject to which the restoration was made;
to avoid which conflicts was one of the purposes of the provision au-
thorizing the president to provide by proclamation for the opening
to settlement, entry, and disposition of the land restored by the act
to the public domain. That provision was in harmony with the
policy theretofore adopted by congress in the opening of large bodies
of land to disposition under the general laws of the United States,
such as the opening of Oklahoma and the Cherokee Strip, whereby
a certain date in the future was authorized to be fixed for the open-
ing, and all persons thereby put upon an equal footing. This, we
think, was the clear intent of the act of July 1, 1892, as shown by
its own provisions. That it was so understood and construed by
the officers of the land department of the government is conceded,
and that it is the interpretation that congress itself put upon the act
has been shown by its subsequent act of February 20, 1896, and is
further shown by its passage of the act of March 6, 1896, by which
it granted to the Columbia & Red Mountain Railway Company a right
of way 100 feet in width over the portion of the reservation in ques-
tion described in section 1 of the act of July 1, 1892, which would have
been an entirely useless piece of legislation if that land had been,

by that act, irrespective of the proclamation of the president, restored to the mass of public lands for all purposes except pre-emption, settlement, homestead, and other like entries; for, in respect to the public lands subject to disposal under general laws, the act of March 3, 1875, entitled "An act granting railroads a right of way over the public lands of the United States," applies, and there was no need of any other law for that purpose. The judgment is reversed, and the cause remanded to the court below for further proceedings in conformity with this opinion.

(October 23, 1899.)

GILBERT, Circuit Judge (dissenting). I am of the opinion that the circuit court had no jurisdiction of this cause for the reasons which were expressed in the dissenting opinion in the case of Mining Co. v. Rutter, 31 C. C. A. 223, 87 Fed. 801.