# NORTHERN PACIFIC RAILWAY COMPANY *v.* WISMER, SUBSTITUTED FOR WISMER.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH. CIRCUIT.

No. 152.   Argued January 28, 29, 1918.—Decided March 4, 1918.

Lands opposite the line of the Northern Pacific Railroad Company constituting an Indian reservation when the line was definitely located, were not embraced in the grant of odd numbered sections made to the company by the Act of July 2, 1864, c. 217, 13 Stat. 365.

A reservation of public lands for and exclusively devoted to the occupancy of a tribe of Indians, made under the direction and with the approval of the Commissioner of Indian Affairs, and expressly or tacitly approved by the Secretary of the Interior, *held* valid and effectual to exclude the lands from the Northern Pacific grant, although not formally sanctioned by the President until after the railroad had filed its plat of definite location.

230 Fed. Rep. 591, affirmed.

THE case is stated in the opinion.

*Mr. Charles Donnelly,* with whom *Mr. Charles W. Bunn* was on the brief, for plaintiff in error.

*Mr. Assistant Attorney General Kearful* for defendant in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

This suit is one in ejectment by the Northern Pacific Railway Company to recover possession of eighty acres of land (the title to 64,000 acres depends upon the decision), and it is here on writ of error to review the judgment of the Circuit Court of Appeals, affirming that of the District Court in favor of the defendant.

The principles of law applicable to the case are few and well settled and the decision of it depends upon the interpretation to be given to stipulated facts.

The plaintiff in error is the successor in interest to the Northern Pacific Railroad Company, and the defendant in error, substituted for the deceased defendant, George F. Wismer, claims to own the land in controversy by virtue of a homestead entry made in 1910, upon which a patent was issued in 1913. ·

By act of Congress dated July 2, 1864, 13 Stat. 365, there was granted to the Northern Pacific Railroad Company, for the purpose of aiding in the construction of its line to the Pacific Coast, twenty alternate odd-numbered sections of land per mile on each side of the railroad line, which it should locate and adopt, within the boundaries of any Territory and ten alternate odd-numbered sections per mile on each side of the railroad line, which it should adopt, within the boundaries of any State. The grant embraces only lands to which, "the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed."

On October 4, 1880, the Railroad Company definitely located the position of its line opposite the land in controversy and filed a plat thereof, as required by law, and it is claimed that upon the filing of this plat the company became entitled to the lands granted, including those of the defendant in error, as of July 2, 1864, the date of the granting act of Congress.

The claim of the defendant in error, which prevailed in each of the lower courts, is that the land in controversy was reserved or otherwise appropriated, within the meaning of the terms of the grant to the Railroad Company of 1864, quoted above, at the time this part of the line of the railroad was definitely located, for the reason that it was then within an Indian Reservation, or was subject to an

Indian claim, which prevented the grant attaching to it, by virtue of the following facts, which we condense from the stipulation between the parties.

Prior to August 16, 1877, bands of Indians of the Spokane and other tribes occupied, for hunting and fishing, the extensive territory now comprising the eastern part of the State of Washington, in which they had not then ceded to the United States any part of their rights. In the spring of that year certain of these Indian tribes commenced hostilities against the white settlers which resulted in war with the United States, in which they were urging the Spokane tribe, then at peace, to join.

On May 7, 1877, the Commissioner of Indian Affairs directed Col. E. C. Watkins, an Indian Inspector, in charge of all agencies in Washington Territory, to give his "special attention" to the subject of gathering the roving Indians "upon permanent reservations," with the result that on August 16, 17, 18, 1877, a Council was held at Spokane Falls, Washington, between the Chiefs and Headmen of the Spokane tribe of Indians and Colonel Watkins, acting "in his official capacity as Indian Inspector, representing the Department of the Interior," and General Frank Wheaton, and Captain M. C. Wilkinson, of the United States Army, representing the Department of War.

It is expressly stipulated "that for the purpose of collecting the said Indians belonging to the said tribe (the Spokane tribe) on a reservation," and of inducing them: to establish homes and to engage in agricultural pursuits; to extinguish their title "to all other lands not within the said reservation" and to remain at peace with the United States, the agreement following was signed by the representatives of the Government of the United States and the Chiefs and Headmen of the tribe who attended the Council, viz:

"In Council at Spokane Falls, W. T.   August 18th, 1877.

"We, the undersigned Chiefs and head men of the Spokané Tribe of Indians for ourselves and our people hereby agree to accept the following described land for our reservation: Beginning at the source of the Chimokan Creek in Washington Territory, thence down said creek to the Spokane River, thence down said River to the Columbia River, thence up the Columbia River to the mouth of Nimchin Creek, thence easterly to the place of beginning.

"And we do further agree to go upon the same by the first of November next with a view of establishing our permanent homes thereon, and engaging in agricultural pursuits. We hereby renew our friendly relations with the whites and promise to remain at peace with the Government and abide by all laws of the same, and obey the orders of the Indian Bureau and the officers acting thereunder."

On August 23 Col. Watkins reported the result of the Council to his superior officer, the Commissioner of Indian Affairs, and sent him a copy of the executed agreement, with his recommendation that the territory described therein should be set apart and reserved for the Spokane tribe.

Immediately after the signing of this agreement and prior to November 14th of the same year, Col. Watkins, still "acting in his official capacity, located such of the said Spokane Indians as were not already residing thereon upon said *reservation*" described in the agreement, and on November 26, 1877, he reported this action to his superior, the Commissioner of Indian Affairs, who communicated it to the Secretary of the Interior, with his approval, on December 29, 1877, who, in turn, communicated it to the United States Senate on January 23, 1878.

The Indians remained at peace with the United States and continued in the use and occupancy of the lands described in the agreement and claimed the same "as their reservation" until the year 1910.

The encroachment of squatters upon the land thus reserved resulted in an order by Brigadier General Howard on September 3, 1880, directing that the military force under his command should protect the territory described in the agreement of August, 1877, against settlement by others than the Spokane Indians until survey of the land should be made or until further instructions.

On January 18, 1881, President Hayes, by Executive Order, formally set aside and reserved the territory described in the agreement of August, 1877, for the use and occupancy of the Spokane Indians.

The Indians occupied the reservation until after the Act of May 29, 1908, was passed (35 Stat. 458) directing that the Secretary of the Interior should cause allotments to be made, under the allotment laws, to all Indians having tribal rights and belonging to the Spokane Indian Reservation who had not theretofore received allotments, and providing that the surplus agricultural lands should be opened for settlement and entry under the homestead laws, and that the net proceeds derived from the sale of such lands should be deposited in the United States Treasury to the credit of the Indians of the Spokane Reservation. It was under the provisions of this act that the decedent of the defendant in error obtained his patent.

This summary of the stipulated facts points to the inevitable decision of the case.

The Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, was charged with the management of all Indian affairs and matters arising out of Indian relations (Rev. Stats., §§ 441, 463, 2058, 2149), and clearly he commissioned Col. Watkins in advance to treat with the Spokane tribe for the setting apart to them of a permanent reservation through an agreement such as that of August, 1877. The plaintiff in error concedes, as it must, that if the Secretary of the Interior approved the action taken by Colonel Watkins prior to the filing

of the plat of its line on October 4, 1880, the reservation
must be considered as lawfully established and the lands
thereby removed beyond the scope of the grant to the
Railroad Company. (*Wilcox* v. *Jackson*, 13 Pet. 498, 512;
*Wolsey* v. *Chapman*, 101 U. S. 755, 769; *Wood* v. *Beach*,
156 U. S. 548; *United States* v. *Midwest Oil Co.*, 236 U. S.
459; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *United
States*, 244 U. S. 351, 357.) And reservations made by
heads of bureaus, such as the Commissioner of the Gen-
eral Land Office, or the Commissioner of Indian Affairs,
in the administration of the matters committed to their
charge, stand upon the same footing where the Secretary
of the Interior is informed of their action and where as in
this case, he either expressly or tacitly approves the same.
*Spencer* v. *McDougal*, 159 U. S. 62.

Such being the law, we cannot doubt that the sound
inference from the stipulated facts as we have stated
them is that, with full understanding of the situation the
Secretary of the Interior and the Commissioner of In-
dian Affairs approved the action of Colonel Watkins not
later, certainly, than the sending of his report to the Sen-
ate on January 23, 1878, which was almost three years
prior to the filing of the railway company's plat, and that
the Executive Order of the President on January 18, 1881,
simply continued and gave formal sanction to what had
been done before.

That the reservation was in fact made and the lands
exclusively devoted to the use of the Indians from the
date of the agreement of August, 1877, is beyond con-
troversy; that no objection was ever made by his superiors
to the action taken by Colonel Watkins is equally clear,
and to hold that, for want of a formal approval by the
Secretary of the Interior, all of the conduct of the Govern-
ment and of the Indians in making and ratifying and in
good faith carrying out the agreement between them,
even to the extent of protecting the reservation by mil-

itary forces from intrusion, is without effect, would be to subordinate the realities of the situation to mere form, for the delay in the issuing of the formal Executive Order of the President under the circumstances can be attributed only to the exigencies of the public business;—by his representative, the Secretary of the Interior, he had approved the setting apart of the lands to the use of the Indians almost three years before.

The judgment of the Circuit Court of Appeals will be affirmed for the reason that the Spokane Indian Reservation was lawfully created prior to the filing of the plat of the line of the plaintiff company on October 4th, 1880.

*Affirmed.*