WILBUR, Secretary of the Interior, v. UNIT-
ED STATES ex rel. BARTON.*
No. 5241.

Court of Appeals of District of Columbia.
Argued Oct. 15, 1930.
Decided Dec. 1, 1930.

Petition for Rehearing Denied Dec. 13, 1930.

VAN ORSDEL, Associate Justice, dis-
senting.

*Certiorari granted 51 S. Ct. 343, 75 L. Ed. ---.

O. H. Graves and E. C. Finney, both of Washington, D. C., for appellant.

James Conlon, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice.

Appeal from a judgment in the Supreme Court of the District directing the issuance of a writ of mandamus to compel the Secretary of the Interior "to reinstate the application of the petitioner, Roy G. Barton, * * * and to proceed thereon according to law."

Should the judgment be affirmed, it probably would result in the reinstatement of "more than 5,000 applications for oil and gas permits on public lands pending in the General Land Office in Washington and an unknown number in the field offices."

The cause was heard on petition and answer. There is no dispute as to the facts, which are substantially as follows: On June 6, 1928, Barton filed an application in the Land Office at Las Cruces, N. M., for a permit to prospect for oil and gas in a certain described tract of public land of the United States (Act of February 25, 1920, 41 Stat. 437).

On March 13, 1929, the Department of the Interior released a "Memorandum for the Press," reading in part as follows: "Secretary Wilbur, of the Department of the Interior, to-day asked the Commissioner of the General Land Office to send instructions to all local land offices to the effect that they are not to receive further applications for permits to prospect for oil and gas on the public domain, and to reject all applications now pending. These instructions are in accordance with the statement issued at the White House yesterday to the effect that 'there will be complete conservation of Government oil in this administration.'"

On the same day a telegram was forwarded by the Department to the various United States land offices, including the land office at Las Cruces, N. M., reading in part as follows: "No oil and gas prospecting permits will be issued on and after March 12, 1929. Reject all applications for oil and gas permits now pending in your office and receive no more. All orders for drawings hereby revoked."

On March 16, 1929, Departmental Order No. 337 was issued, reading in part as follows: "The Federal oil conservation policy announced by President Hoover will be energetically executed by the Interior Department. There are more than 5,000 applications for oil and gas permits on public lands pending in the General Land Office in Washington and an unknown number in the field offices. Steps were taken several days ago toward the rejection of all such applications, and registers of local land offices have been instructed not to receive new applications. Probably in none of the cases on hand has the applicant expended money for development purposes, although he may have gone to some expense in opposing conflicting claims or furnishing additional evidence in support of his application. * * * To determine the facts in connection with existing oil and gas permits I have named a committee consisting of the Commissioner of the General Land Office, the Director of the Geological Survey, and the solicitor of the department. They will consider the extent of operations which have been prosecuted under outstanding permits to determine whether permittees have acquired equities which should be recognized and to make appropriate recommendations. Where permits are now in good standing, either because of recent issue or previous extension of time, no action will be taken during the remaining period covered by the permit. When that time has expired, however, and the permittee has failed to comply with the terms of his permit, he will be called upon immediately to show cause why the permit should not be canceled. * * * No leases will be issued for oil and gas production unless required by mandate of law, such as discovery under existing permits, as provided by the mineral leasing act, or through the advertisement of a minimum of 25,000 acres of Osage Indian lands annually, as directed by the act of Congress approved March 2, 1929." This order also was incorporated in a "Memorandum for the Press" issued by the Department on the same day.

On March 26, 1929, the Commissioner of the General Land Office, "pursuant to instructions approved by the Secretary of the Interior March 13, 1929, and in accordance with the policy announced in Departmental Order No. 337 of March 16, 1929, rejected" Barton's application. An appeal was taken, and the order of rejection was sustained

by the Department in a decision dated September 4, 1929.

In his petition Barton avers "that there is nothing in or under the provisions of the Act of February 25, 1920 (41 Stat. 437), * * * which requires your relator to make any substantial expenditures for reliable geological surveys upon the lands embraced in his oil and gas application * * * in order to entitle him to a permit for the lands described in said application;" and that "the Secretary of the Interior is without authority of law to reject his application upon any ground, and especially upon the ground alleged that no applications for permits will be allowed after March 12, 1929, because of the adoption of a new policy as set out in said press notices of March 13, 1929, hereinabove quoted, and March 16, 1929, also identified as Departmental Order No. 337."

The answer admits, for the purposes of this suit, that Barton "was duly qualified under the law to receive the permit for which he applied; that at all times relator (Barton) was and is now ready, able, and willing to comply with all regulations made pursuant to the said act of Congress respecting the duties and obligations of permittee."

Did the orders of the Secretary of the Interior amount to a temporary withdrawal of the public land from location, entry, and exploration for the purpose of discovering oil or gas; and, assuming the withdrawal, did the mere filing of an application for a prospecting permit initiate a right in the applicant that could not be affected by the withdrawal?

The Act of June 25, 1910 (36 Stat. 847), "to authorize the President of the United States to make withdrawals of public lands in certain cases," reads in part as follows: "Be it enacted * * * That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." Section 1 (43 USCA § 141).

Prior to 1910 the President had acted in scores of cases without express statutory authority, and in United States v. Midwest Oil Co., 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673, his authority to make such withdrawals was expressly sustained.

There can be no doubt that the effect of the orders issued by the Secretary was to withdraw from further location, entry, and exploration for the discovery of oil and gas all public land, and that the purpose of such withdrawal was to meet conditions due to great overproduction and to conserve oil and gas in the public interest. That such was the intent of the Secretary and the understanding of the public is equally plain. It is immaterial that the orders were not limited as to time, for the act of 1910 provides that such withdrawals or reservations shall remain in force until revoked by the President or by an act of Congress.

The next question to be determined is whether the withdrawal of the Secretary was the withdrawal of the President. It is settled law that "the president speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties" (Wilcox v. Jackson, 13 Pet. 498, 513, 10 L. Ed. 264), and that "the acts of the heads of departments, within the scope of their powers, are in law the acts of the President" (Wolsey v. Chapman, 101 U. S. 755, 769, 25 L. Ed. 915). In the case last mentioned it was held that the order of the Secretary of the Interior, directing that the lands on the Des Moines river above the Racoon fork be reserved from sale, was in contemplation of law the order of the President and had the same effect as the proclamation mentioned in the Act of September 4, 1841 (5 Stat. 453). The court said: "A proclamation by the President, reserving lands from sale, is his official public announcement of an order to that effect. No particular form of such an announcement is necessary. It is sufficient if it has such publicity as accomplishes the end to be attained. If the President himself had signed the order in this case, and sent it to the registers and receivers who were to act under it, as notice to them of what they were to do in respect to the sales of the public lands, we cannot doubt that the lands would have been reserved by proclamation within the meaning of the statute. Such being the case, it follows necessarily from the decision in Wilcox v. Jackson that such an order sent out from the appropriate executive department in the regular course of business is the legal equivalent of the President's own order to the same effect. It was, therefore, as we think, such a proclamation by the President re-

serving the lands from sale as was contemplated by the act." See, also, United States v. Morrison, 240 U. S. 192, 36 S. Ct. 326, 60 L. Ed. 599; Northern Pacific Railway Co. v. Wismer, 246 U. S. 283, 38 S. Ct. 240, 62 L. Ed. 716; Relation of the President to the Executive Departments, 7 Op. Attys. Gen. 453.

In the present case the orders of the Secretary gave effect to the previously announced policy of the President, were acquiesced in by him, and were in legal contemplation his acts. Was the President vested with such authority?

It is not contended that the Act of June 25, 1910 (36 Stat. 847), expressly authorizing the President to make temporary withdrawal "from settlement, location, sale, or entry any of the public lands of the United States," has been repealed. The contention is that the Act of February 25, 1920 (41 Stat. 437), "to promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain," and providing that public lands containing deposits of such minerals "shall be subject to disposition in the form and manner provided by this Act," was mandatory, and that the President was without power to withdraw such lands from disposition as provided in the act. Section 13 of that act (30 USCA § 221), relating to oil and gas, provides in part: "That the Secretary of the Interior is hereby authorized, under such necessary and proper rules and regulations as he may prescribe, to grant to any applicant qualified under this Act a prospecting permit, which shall give the exclusive right, for a period not exceeding two years, to prospect for oil or gas upon not to exceed two thousand five hundred and sixty acres of land. * * * Whether the lands sought in any such application and permit are surveyed or unsurveyed the applicant shall, prior to filing his application for permit, locate such lands in a reasonably compact form and according to the legal subdivisions of the public land surveys if the land be surveyed. * * *"

Section 14 (30 USCA § 223) provides in part that: "Upon establishing to the satisfaction of the Secretary of the Interior that valuable deposits of oil or gas have been discovered within the limits of the land embraced in any permit, the permittee shall be entitled to a lease for one-fourth of the land embraced in the prospecting permit. * * *"

There is no provision in the act purporting to repeal or modify the act of 1910,

and in our view such a modification may not be implied. The provision in the first section (30 USCA § 181) that the lands containing certain named mineral deposits "shall be subject to disposition in the form and manner provided by this Act" is general, and no more mandatory than was the provision in the act of 1872 (17 Stat. 91, Rev. St. §§ 2319, 2329 [30 USCA §§ 22, 35]), declaring all public lands containing petroleum or other mineral oils to be "free and open to occupation, exploration and purchase by citizens of the United States * * * under regulations prescribed by law"; and yet the President withdrew without direct congressional authority such public lands, and his action was sustained in the Midwest Case, 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673. But it is insisted that the act of 1910 only authorizes the temporary withdrawal by the President of public lands "from settlement, location, sale, or entry," and that the application for permit and the lease which may follow discovery of oil under the act of 1920 are not embraced within those terms. It is apparent, we think, that the act of 1910 was intended to be of wide scope and recognized the authority of the President temporarily to prevent the alienation of public lands or any interest therein adverse to the United States.

In Mason v. United States, 260 U. S. 545, 43 S. Ct. 200, 201, 67 L. Ed. 396, by Executive order dated December 15, 1908, lands had been "withdrawn from settlement and entry, or other form of appropriation." It was contended that this order did not include appropriations by mining locations. The court observed: "The words 'settlement and entry,' it is said, apply only to the act of settling upon the soil and making entry at a land office, as, for example, under the homestead laws; that mining lands are acquired, not by settlement or entry, but by location and development; and that this process is not covered by the words 'other form of appropriation,' limited, as they must be, by the associated specific words, to those forms of appropriation which are akin to a settlement and entry. * * * If the appropriation of mineral lands by location and development be not akin to settlement and entry, what other form of appropriation can be so characterized?* [Italics ours.] None has been suggested and we can think of none. * * * Moreover, the circumstances leading up to and accompanying the issuance of the order demonstrate conclusively that its main, if not its only, purpose was to preserve from private appropriation the oil and

gas which the lands were thought to contain pending investigation and congressional action, and this purpose would have been subverted by appropriations of the nature here involved quite as much as by other forms. We conclude, therefore, that the mining locations here relied upon fell clearly within the withdrawal order and consequently were prohibited by it."

Under the act of 1920, the applicant for a permit was required to locate and designate the lands sought in his application. The issuance of a permit and the discovery of "valuable deposits of oil or gas" entitled him to a lease—an interest in the land. This, we think, was akin to location or entry, as used in the act of 1910.

If, as suggested by counsel for appellee, the act of 1910 has no application, then it well might be held that an implied power to withdraw was reposed in the President under the act of 1920. United States v. Midwest Oil Co., 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673.

■ Under the general mining laws, a citizen was free to go upon the public domain. He did the work necessary to discover minerals, staked his claim, recorded notice in the mining district or county records, and his rights became fixed. Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313; Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735. This was true as to public lands containing oil and gas until the Act of February 25, 1920 (41 Stat. 437). Under the provisions of that act, as already appears, a citizen no longer has a right to go upon public lands of the United States to prospect for oil or gas, unless permitted to do so by the Secretary of the Interior, under such "proper rules and regulations as he may prescribe" (section 13). It is at once apparent that there is a marked distinction between the old law and the new. Under the old law a citizen was free to make exploration as a matter of right. Under the new law he must apply for the privilege. Until that privilege is granted, through the issuance of a permit, he has no vested interest. It is apparent, we think, that Congress recognized the distinction between the old law and the new and that the President might at any time, if conditions changed, withdraw the public lands from exploration. Under section 13 the Secretary is "authorized" to grant prospecting permits. Under section 14, if a permit has been granted and the permittee has incurred the expense incident to the exploration and discovery of

"valuable deposits of oil or gas," he "shall be entitled to a lease." Thus Congress recognized that the mere filing of an application for a permit confers no vested right upon the applicant, but that if a permit be issued and he goes on the land and makes a discovery he has such an interest as must be recognized.

■ Congress, of course, knew that, if changed conditions rendered advisable the temporary withdrawal by the Executive of the public lands from further exploration, thousands of such applications for permits might be pending. It was careful, therefore, to distinguish between an application for a permit, and the rights that might be acquired under an issued permit. Every applicant for a permit was charged with knowledge that the Executive might temporarily withdraw the lands from further exploration, and that his application was, therefore, subject to such authority of the Executive. We rule that the order of the Secretary rejecting Barton's application for a permit was a valid exercise of power by the Executive.

■ Mandamus is awarded, not as a matter of right, but in the exercise of a sound judicial discretion, to remedy and not to promote a wrong, to compel the performance of an actual duty rather than to direct the performance of an act which will work public or private mischief. While classed as a legal remedy, its issuance is largely governed and controlled by equitable principles. Duncan Townsite Co. v. Lane, 245 U. S. 308, 38 S. Ct. 99, 62 L. Ed. 309; Arant v. Lane, 249 U. S. 367, 39 S. Ct. 293, 63 L. Ed. 650; Ex Parte Skinner & Eddy Corp., 265 U. S. 86, 44 S. Ct. 446, 68 L. Ed. 912; Work v. U. S. ex rel. Rives, 267 U. S. 175, 45 S. Ct. 252, 69 L. Ed. 561; Payne v. United States, 50 App. D. C. 119, 269 F. 198; Morgan v. Howard, 54 App. D. C. 3, 293 F. 650; Stowell v. Deming, 57 App. D. C. 223, 19 F.(2d) 697. In the exercise of a sound judicial discretion, the court must be controlled by settled legal principles.

■ As observed in the Midwest Case, 236 U. S. 471, 35 S. Ct. 309, 312, 59 L. Ed. 673: "The President was in a position to know when the public interest required particular portions of the people's lands to be withdrawn from entry or location; his action inflicted no wrong upon any private citizen, and being subject to disaffirmance by Congress could occasion no harm to the interest of the public at large." In the present case,

his orders, issued through the Secretary, were intended to meet an emergency occasioned by the great overproduction of oil and gas, the waste incident thereto, and other public considerations. There was available to him the advice of the Attorney General on all questions of law that might be involved. It was necessary to interpret the applicable statutes, and we have expressed the view that they were correctly interpreted; but, in any event, it would require a very clear case to justify a court in arresting and suspending the action of the Executive taken in the public interest. The record does not present such a case.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed.

VAN ORSDEL, Associate Justice (dissenting).

I am compelled to dissent from the opinion and judgment of my associates.

It is conceded that the applicant Barton possessed all the qualifications necessary under the Leasing Act to entitle him to a permit. In other words, but for the order of the Secretary suspending the operation of the Leasing Act, he would have been compelled to grant Barton's application. We start, therefore, with an applicant entitled to a permit at the time the order was made suspending the provisions of the Leasing Act.

The act of 1910, vesting authority in the President to withdraw public lands from "settlement, location, sale, or entry," specifically provides the terms upon which this Executive authority may be exercised. It must be done by a formal proclamation, which the Secretary of the Interior is required, by the terms of the act, to report to Congress at the next regular session after the date of withdrawal. Prior to the enactment of this statute, lands had been withdrawn by proclamation of the President without any particular authority of statute. Congress, therefore, in the 1910 act, manifested a clear intention to keep control of the withdrawals of public lands to the extent of specifying the manner and terms under which they could be withdrawn by the President, and in addition requiring notice to be given it of such withdrawals by the Secretary of the Interior in order that the action of the President, if deemed advisable, might be promptly revoked.

This brings us to what was done in this case. No proclamation, formal or otherwise, its own land, amounting to a withdrawal of the land from entry and settlement; and, was ever issued by the President, and no notice of any proclamation was given Congress by the Secretary, as required by the 1910 act. The order of the Secretary, telegraphed the local land officers, was based upon the following newspaper report under date of March 12, 1929, purporting to express the views of the President: "There will be no leases or disposal of government oil lands, no matter what category they may lie in, of government holdings or government controls, except those which may be mandatory by Congress. In other words, there will be complete conservation of government oil in this administration."

It will be observed that this merely purports to state a future policy which the President might or might not adopt in respect to government oil lands. It was not transmitted by the President to the Secretary of the Interior. The information upon which he based his order was obtained exclusively through the press. The press report merely referred to a declaration said to have been made by the President, which he could only make effective by a formal proclamation. There was therefore no proclamation whatever under the terms of the 1910 act which would justify in the remotest degree the action taken by the Secretary of the Interior.

Neither can the action of the Secretary be upheld under the doctrine of acquiescence. It is undoubtedly true that "the acts of the heads of departments, within the scope of their powers, are in law the acts of the President." The President is the head of the Executive Department of the government, and the lawful acts of his subordinates will be presumed to be his acts, but this presumption does not extend to unlawful acts of subordinates. The difficulty here is that the Secretary acted without the scope of his power in the suspension of the Oil Leasing Act. He was totally without power to act until certain statutory conditions had been complied with, namely, the issue of a proclamation by the President.

The cases relied upon in the majority opinion are not in point. In Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264, a pre-emption entry had been made upon land set aside and occupied for more than twenty years as a military reservation, on which the government had expended large sums of money un-

der the direction of the Secretary of War. Of course, a long-continued use of public land by the government itself for military purposes, or for other purposes, would constitute an occupancy by the government on whether done by direct authority of the President or by the lawful act of the Secretary of War, the President, after this long lapse of time, would be assumed to have acquiesced in the withdrawal and occupation of the land.

The case of Wolsey v. Chapman, 101 U. S. 755, 25 L. Ed. 915, has even less application to the present case than does the Wilcox Case. Here, a large tract of land had been granted to the territory of Iowa for the development of navigation on the Des Moines river. The execution of the act was delegated to the Secretary of the Interior, and was accordingly within the lawful scope of the authority vested in him. A controversy arose as to the limits of the land granted—whether it extended beyond a point in the river known as Raccoon fork. The matter required determination from many angles by the Department of the Interior, and, to protect the interests of all concerned, the Secretary suspended settlement on the lands in question until the matter could be legally determined. It was said, and properly so, that the act of the Department, being within the scope of its powers, would be regarded in law as the act of the President. The difference between that case and the one at bar is that here there is only one law under which a withdrawal such as we are here considering can be made, namely, through the proclamation act of 1910. This act is a specific grant of power by Congress to the President by which he may in his discretion withdraw public lands from entry, sale, or settlement. Being a grant of power belonging to Congress, it should strictly be complied with, and the courts will not imply compliance from circumstances such as those involved in this case.

The case of United States v. Midwest Oil Co., 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673, has little or no analogy to this case. There, the proclamation of the President, issued before the enactment of the 1910 statute, hence without specific statutory authority, described accurately the territory withdrawn, the character of the land, and the object of withdrawal. The President, doubtful of his authority in the premises, submitted the whole matter to Congress for its approval. It resulted in the prompt enactment of the 1910 statute. The proclamation was prepared with all the formalities and dig-

nity of a document promulgated by the President with a view to affecting great public and private interests. In that case the oil company entered upon the lands after the proclamation was issued. The court, in its opinion, strongly implied that if the entry upon the lands had been made prior to the issuance of the proclamation by the President, it would have had a different case. Here the application was filed prior to the order of the Secretary, and here there was no proclamation whatever as required by statute.

It is not true that the applicant was required to do nothing on the land before filing his application for a permit. He was required by the Leasing Act to seek out the location, to post notices, giving a description of the land for which application would be made—if surveyed land, by the lines of survey; if unsurveyed, by descriptive metes and bounds. This constituted an entry upon the land, which developed into a right with the filing of the application of which the applicant cannot be divested by any act of the Executive Department. This is settled law by numerous decisions of the Supreme Court as to entry upon public lands, such as homestead, pre-emption, etc. Entry upon oil lands is in every respect entitled to the same legal significance as entry upon lands for the purpose of acquiring title. In Mason v. United States, 260 U. S. 545, 43 S. Ct. 200, 202, 67 L. Ed. 396, it was contended that the words "settlement and entry" applied only to the act of settling upon the soil and making entry in the Land Office, and that it did not apply to mining lands which it was contended were not acquired by settlement and entry but by location and development; but the court said: "If the appropriation of mineral lands by location and development be not akin to settlement and entry, what other form of appropriation can be so characterized? None has been suggested and we can think of none."

This is not an action to mandamus the President. The writ runs against the Secretary of the Interior and the Commissioner of the General Land Office. The President, so far as I am able to observe, has had nothing to do with this case. The case grew out of orders originated in the Land Department, based upon newspaper rumor; and the action here is to compel the Secretary of the Interior and the Commissioner of the General Land Office to perform purely administrative duties imposed upon them by law. That mandamus will lie for this pur-

pose is too elementary to require citation of authority. While the judgment is to require a departmental officer to perform a purely administrative duty imposed by Congress, the court has no power under the sanction of "judicial discretion" to withhold its mandate, even though, in its judgment, to compel the enforcement might not be in the public interest. The policy of the law belongs to the legislative and not the judicial department of the government.

The court is called upon here to determine purely questions of law, and it is immaterial whether one, or five thousand, or ten thousand applicants would be affected by the court's decision. Neither, in the agitated state of the public mind, should the fact that this is an "oil case" entitle it to any particular sanctity in the eyes of the law, or furnish adequate ground for the wholesale slaughter of private property rights by judicial decree. The present inquiry is limited to determining the important questions of law here involved. It would seem, therefore, unnecessary to consider the facts stressed in the majority opinion "that the purpose of such withdrawal was to meet conditions due to great overproduction and to conserve oil and gas in the public interest"; or that, if the judgment be affirmed in this case, "it would probably result in the reinstatement of 'more than five-thousand applications for oil and gas permits on the public lands pending in the Land Office in Washington, and an unknown number in the field offices.'"

These might furnish commendable reasons for a proper and lawful withdrawal of the lands either by formal proclamation of the President or by act of Congress, but we have hardly reached the period where the laws of the land can be suspended or repealed by the arbitrary methods here employed.

For the reasons stated, the judgment should be affirmed.