**UNITED STATES v. WALKER RIVER IRR. DIST. et al.**

**No. 8779.**

Circuit Court of Appeals, Ninth Circuit.

June 5, 1939.

Rehearing Denied July 14, 1939.

Carl McFarland, Asst. Atty. Gen., Charles E. Collett, Acting Asst. Atty. Gen., C. W. Leaphart and Roy W. Stoddard, Sp. Assts. to Atty. Gen., and William D. Donnelly, Oscar A. Provost, Thomas E. Harris, Clifford E. Fix, and Robert Koerner, Attys., Department of Justice, all of Washington, D. C., for the United States.

William M. Kearney, Edward F. Lunsford, Myron R. Adams, and Robert Taylor Adams, all of Reno, Nev., George L. Sanford, of Carson City, Nev., and William H. Metson, of San Francisco, Cal., for appellees.

Before GARRECHT, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The United States brought suit to restrain the appropriators of the waters of the Walker River and its tributaries from interfering with the natural flow of the stream, to the extent of 150 cubic feet per second, to and upon the Walker River Indian Reservation in Nevada. The bill prayed that the plaintiff be adjudged to have a prior right to that quantity of water, that the relative rights in the stream be adjudicated, and that a water master be appointed to carry the decree into effect. After extended hearings before a special master, the court made findings and entered a decree adjudging the United States to be entitled to 22.93 second feet of water with priorities as of various dates, ranging from 1868 to 1886. From this decree the Government has appealed.

The factual background is fully developed in the opinions of the court below, 11 F.Supp. 158, 14 F.Supp. 10, and no more than a brief summary need be attempted here.

The Walker River Indian Reservation was set aside by departmental action on November 29, 1859 for the use of the Pahute tribe. The lands reserved lie about Walker Lake and on both borders of the lower reaches of the Walker River for a distance of thirty miles above the place where the stream empties into the lake. The total area, mostly rough or mountainous country, is in excess of 80,000 acres. The tillable lands reserved have an area of approximately 10,000 acres.

The Walker River is an unnavigable stream the headwaters of which rise on the eastern slopes of the Sierra Nevada mountains in California. The lands along the stream are arid and incapable of producing crops without irrigation, for which purpose the river is the sole source of supply. The lands in the upper valleys were acquired by appellees or their predecessors under the public land laws of the United States, the earliest titles originating soon after the establishment of the reservation. During the period commencing with the year 1860 the settlers diverted the water of the stream for irrigation purposes, and the present owners claim priorities based on these appropriations.

The claim of the Government, asserted on behalf of the Indians living on the reservation, is that, to the extent necessary to supply the irrigable lands, the waters of the stream were reserved. The trial court decided that the waters were not reserved and that the rights of the United States to their use, like the rights of other diverters, are to be measured and adjudged in accordance with the local laws and customs governing appropriation. Hence the rights decreed to the Government are made to date from the time of actual diversion and use.

When the lands were set apart for Indian purposes there was no express reservation of the flow of the stream; but it is the position of the Government that there was an implied reservation of the water. The contention is bottomed on the holding

to this effect in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340,[1] in what is claimed to be a cognate situation. The trial court thought Winters v. United States distinguishable, as being based on an agreement or treaty with the Indians. Here there was no treaty. It said that at the time the Walker River reservation was set apart the Pahutes were at war with the whites, hence no agreement between them and the Government was possible.

■ (a) In the Winters case, as in this, the basic question for determination was one of intent—whether the waters of the stream were intended to be reserved for the use of the Indians, or whether the lands only were reserved.[2] We see no reason to believe that the intention to reserve need be evidenced by treaty or agreement. A statute or an executive order setting apart the reservation may be equally indicative of the intent. While in the Winters case the court emphasized the treaty, there was in fact no express reservation of water to be found in that document. The intention had to be arrived at by taking account of the circumstances, the situation and needs of the Indians and the purpose for which the lands had been reserved. As said by the court in Alaska Pacific Fisheries v. United States, 248 U.

S. 78, 39 S.Ct. 40, 41, 63 L.Ed. 138, in speaking of an analogous intent—whether an Indian reservation created by an act of Congress embraced only the uplands or included as well adjacent waters—"it is important, in approaching a solution of the question stated, to have in mind the circumstances in which the reservation was created—the power of Congress in the premises, the location and character of the islands, the situation and needs of the Indians and the object to be attained."

■ (b) The power of the Government to reserve the waters and thus exempt them from subsequent appropriation by others is beyond debate. Winters v. United States, supra, 207 U.S. page 577, 28 S.Ct. 207, 52 L.Ed. 340. The question is merely whether in this instance the power was exercised. If it was, the appellees are in no position to claim paramount rights in the stream, since their appropriations were all later than 1859.

■ It is of course well settled that private rights in the waters of non-navigable streams on the public domain are measured by local customs, laws and judicial decisions. California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356.[3] The act of July 26, 1866, 14 Stat. 251, 253,[4] was

---

[1] Cf. Conrad Investment Co. v. United States, 9 Cir., 161 F. 829; United States v. Powers, 9 Cir., 94 F.2d 783, affirmed 59 S.Ct. 344, 83 L.Ed. 330; United States v. McIntire, 9 Cir., 101 F.2d 650.

[2] The summary of the pleadings and facts as set out in the opinion of this court, 9 Cir., 143 F. 740, and of the Supreme Court, has led to misapprehension concerning the scope of the holding in Winters v. United States. It is assumed by appellees here that in the Winters case the Government had established its rights in the waters of Milk River by prior appropriation. An examination of the record in that case discloses the contrary. The affidavits and testimony before the court showed that in 1890 the Government installed a pump of the capacity of 100 miner's inches for pumping water from the stream for domestic and irrigation purposes. In 1893 another pump of 150 inches capacity was installed. It was not until 1898 that the Government began the construction of a canal for the diversion of the waters of the stream. Meanwhile, commencing with 1890, and prior to 1898, diversion dams and canals had

been built by the settlers above, or by mutual companies which they organized, and large quantities of water had been appropriated and applied to beneficial use.

[3] In Nevada it was held soon after statehood (1864) that where the right to the use of running water was based upon appropriation, and not upon ownership of the soil, the first appropriator had the superior right. Lobdell v. Simpson, 2 Nev. 274, 90 Am.Dec. 537. In 1885, in Jones v. Adams, 19 Nev. 78, 6 P. 442, 3 Am.St.Rep. 788, the common law rule of riparian rights was declared inapplicable to conditions existing in the state. See, also, Vineyard Land & Stock Co. v. District Court, 42 Nev. 1, 171 P. 166, and United States v. Humboldt Lovelock Irrig. L. & P. Co., 9 Cir., 97 F.2d 38, 42, 43.

[4] Section 9: "That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested

no more than a formal confirmation of local law and usage which had theretofore met with silent acquiescence on the part of the national government. Broder v. Natoma Water Co., 101 U.S. 274, 276, 25 L.Ed. 790; California Oregon Power Co. v. Beaver Portland Cement Co., supra, 295 U.S. pages 154, 155, 55 S.Ct. 725, 79 L.Ed. 1356. But it does not follow that the Government may not, independently of the formalities of an actual appropriation, reserve the waters of non-navigable streams on the public domain if needed for governmental purposes.

In United States v. Rio Grande Dam & Irrig. Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, it was said that although this power of changing the common law rule as to streams within its borders undoubtedly belongs in each state, yet two limitations must be recognized: first, that, in the absence of specific authority from Congress, a state cannot destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters, so far, at least, as may be necessary for the beneficial uses of the government property; second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States. The statement of these limitations has been many times repeated in later decisions, notably in California Oregon Power Co. v. Beaver Portland Cement Co., supra, 295 U.S. page 159, 55 S.Ct. 725, 79 L. Ed. 1356. In the Desert Land Act, Act of March 3, 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq., the dedication of nonnavigable waters to the use of the public was expressly made subject to existing rights. And we need not consider the policy exemplified in the Reclamation Act of 1902, 32 Stat. 388, which directed the Reclamation Service to proceed in conformity with the state laws.

■ (c) Appellees attempt to distinguish Winters v. United States on another ground. They say that, unlike the national domain elsewhere, the territory acquired by the treaty of Guadalupe Hidalgo, 9 Stat. 922, is not "Indian country",[5] and no right

of occupancy in the Indians was recognized by the laws of Spain or Mexico, or since given recognition in the public policy of the United States. The point of the argument, as we understand it, is that the members of the Pahute tribe had no rights which they might reserve, and none to surrender in exchange for those now claimed for them.

What the legal status of these aborigines may have been we need not stop to inquire. If it be assumed that they were mere sojourners in the abode of their ancestors, it still remains true that the national government was under compelling obligations to protect them. They are no less wards of the nation than are the tribes living elsewhere. In United States v. Kagama, 118 U.S. 375, 383, 6 S.Ct. 1109, 1114, 30 L.Ed. 228, the court described the Indian communities as wholly dependent on the United States, owing no allegiance to the states and receiving from them no protection. "From their very weakness and helplessness," said the court, "there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen." And see Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299.

■ (d) One further matter should have preliminary attention. Treaties with the Indians and statutes disposing of property for their benefit have uniformly been given a liberal interpretation favorable to the Indian wards. Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Alaska Pacific Fisheries v. United States, supra; United States v. Nez Perce County, 9 Cir., 95 F.2d 232. The rule has its basis in the obligation which the Government has assumed toward a dependent people. We see no reason why the same rule should not apply in the construction of executive orders. Compare McFadden v. Mountain View Mining & Milling Co., 9 Cir., 97 F. 670; Gibson v. Anderson, 9 Cir., 131 F. 39. Treaty provisions for the allotment of reserved lands invariably contemplate the ultimate passing of fee title to the individuals of the tribe; and the General Allot-

---

rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby ac-

knowledged and confirmed * * *." 43 U.S.C.A. § 661.

5 Cf. United States v. McGowan, 9 Cir., 89 F.2d 201, reversed, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410.

ment Act of February 8, 1887, 24 Stat. 388 was expressly made applicable to reservations created by acts of Congress or by executive order.[6] It was pointed out in the illuminating opinion of Attorney General (now Justice) Stone of May 12, 1924 (Opinions of Attorneys General, vol. 34, p. 171), that doubts whether the reservation of lands for the Indians included rights to hidden or latent resources, such as minerals, petroleum or water power, have, as a practical matter, uniformly been resolved in favor of the Indians.

We turn now to the circumstances under which the Walker River Indian Reservation was set aside. The files of the Interior Department bearing on this subject are voluminous. On November 26, 1859, F. Dodge, agent for the Indians in Utah Territory, of which Nevada was then a part, wrote the Commissioner of Indian Affairs suggesting that the northwest part of the valley of the Truckee River, including Pyramid Lake, and the northeast part of the valley of Walker's River, including the lake of the same, be reserved for the Indians of his agency. The localities and boundaries of the proposed reservations were indicated on an accompanying map. "These," stated the letter, "are isolated spots, embracing large fisheries, surrounded by mountains and deserts, and will have the advantage of being their home from choice."[7] The Commissioner of Indian Affairs thereupon wrote the Secretary of the Interior, calling his attention to Dodge's letter, and stating, among other things, "the tracts selected by the Agent, embrace but a small portion of land suited for agricultural purposes, yet, it is believed that there will be a sufficiency for the sustenance of the Washoe and Pahute tribes of Indians, in connection with the fish which they may obtain from Pyramid and Walker Lakes, and with a view to secure suitable homes for these Indians where they can be protected from the encroachments of the whites, I have the honor to suggest that, with your concurrence, the subject may be laid before the President for his consideration, with a recommendation that the tracts of country indicated on the map may be set apart and reserved from sale or settlement, for Indian use."

The Indian Commissioner on November 29, 1859 wrote the Commissioner of the General Land Office, suggesting the propriety and necessity of reserving these tracts for Indian use, and requesting that the Surveyor General of Utah Territory be directed to respect the reservations on the plats of survey when the public surveys should be extended over them, and that in the meantime the local land offices, as established, be instructed to respect the reservations on their books. On December 8 of the same year the Commissioner of the General Land Office wrote the Surveyor General in Salt Lake City, instructing him to reserve for Indian purposes the two tracts described and indicated on an enclosed map.

The Walker River reservation as originally defined was surveyed within a few years, and in 1874 President Grant issued an executive order setting the lands apart for the Pahute and other Indians residing thereon. The action taken in November, 1859 initiated the establishment of the Walker River Indian Reservation. The acts of the heads of departments are the acts of the executive. Wilcox v. Jackson, 13 Pet. 498, 513, 10 L.Ed. 264; Wolsey v. Chapman, 101 U.S. 755, 769, 25 L.Ed. 915. The subsequent proclamation of the President merely gave formal sanction to an accomplished fact. Northern Pac. Ry. Co. v. Wismer, 246 U.S. 283, 38 S.Ct. 240, 62 L.Ed. 716; Minnesota v. Hitchcock, 185 U.S. 373, 385, 389, 390, 22 S.Ct. 650, 46

---

[6] Allotments to individual Indians on the Walker River reservation were made in 1906 under the act of May 27, 1902, 32 Stat. 260 and the General Allotment Act.

[7] Continuing, the agent observed that "the Indians of my agency linger about the graves of their ancestors—'but the game is gone', and now, the steady tread of the white man is upon them. The green valleys too, once spotted with game 'are not theirs now.' Necessity make them barter the virtue of their compan-

ions as a commodity of the market and the bitter contemplation burns in their bosoms the stern reality of their fate. Driven by destitution they seek refuge in crime, and show themselves unsparing because they have been unspared.

"I sincerely hope that those asylums will be made for them, where they can be free from the influence of the 'White Brigands' who loiter about our great overland mail and emigrant routes—using them as their instruments to rob and plunder our citizens."

L.Ed. 954. That this was true of the Pyramid Lake reservation, created at the same time and in the same manner as that on the Walker River, was formally determined by the Department of the Interior in Central Pacific Ry. Co., 45 L.D. 502.

Cultivation of portions of the reservation was early commenced and water for irrigation purposes diverted from the stream. It appears from the files of the Department that not only was the Government desirous of having the Indians learn the arts of husbandry, but that the Indians themselves, who had taken refuge in substantial numbers on the lands reserved, were eager to cultivate the soil and produce crops.[8] The gradual but substantial growth of the practice of farming and irrigation on the reservation is shown in the findings of the trial court.[9]

The Comstock Lode was discovered in 1859, and Nevada abruptly ceased to be a "mere highway for gold seekers on the way to California." Miners and adventurers of all sorts swarmed into the territory.[10] The promptness with which the suggestions of Indian Agent Dodge were carried out shows that the Department realized the urgency of the problems confronting the Indian population.[11] It required little foresight to anticipate the speedy settlement by the whites of the valleys of the Walker River and the consequent diversion of the waters of the stream which actually took place. The necessity of having a water supply if any crops were to be produced on the reservation was known to the Department. It

would be irrational to assume that the intent was merely to set aside the arid soil without reserving the means of rendering it productive. It could not but be realized that the Indians, unskilled in the art of farming, would necessarily make slow progress, and that in any race for the actual appropriation of the stream this backward people would inevitably be left at the barrier. The good faith of the attempt to induce the Indians to make their homes on the reservation, and to remain there, seems inconsistent with a purpose of reserving the lands only, leaving the waters of the stream to be diverted without limit by settlers above.

■ Appellees point to the heavy expense of reclaiming their lands and to the conduct of the Government in permitting and encouraging settlement, particularly the acquisition of title under the Desert Land Act of 1877. They urge on these grounds that the Government is estopped to question the priority of their appropriations. Similar arguments were made unavailingly in Winters v. United States.[12] Compare Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622. The settlers who took up lands in the valleys of the stream were not justified in closing their eyes to the obvious necessities of the Indians already occupying the reservation below.

■ We hold that there was an implied reservation of water to the extent reasonably necessary to supply the needs of

---

[8] Commencing with the act of March 3, 1863, 12 Stat. 774, 791, numerous appropriations were made for the Indian Service in the territory of Nevada, and later in the state, for "presents of goods, agricultural implements, and other useful articles, and to assist them to locate in permanent abodes and sustain themselves by the pursuits of civilized life."

[9] The finding is that water from the Walker River was diverted and used beneficially upon the reservation as follows:

| Priority | Cubic Feet Per Second | Acres |
|---|---|---|
| 1868 | 4.70 | 385.95 |
| 1872 | 3.55 | 295.80 |
| 1875 | 6.15 | 512.80 |
| 1883 | 7.50 | 625.20 |
| 1886 | 1.03 | 85.80 |

[10] In 1860 the population of Nevada was 6,857. The mining rush increased it to 42,491 by 1870. Encyclopedia

Britannica, "Nevada", vol. 16, p. 269.

[11] Under instructions from Washington the local Indian agent gave public notice of the reservation of these areas for Indian purposes, and citizens of the territory were required to refrain from trespassing.

[12] In the briefs of appellants filed in this court in that case, 9 Cir., 148 F. 684, attention was called to § 3 of the act of Congress ratifying the agreement with the Ft. Belknap Indians, 25 Stat. 133, expressly declaring "That lands to which the right of the Indians is extinguished under the foregoing agreement are a part of the public domain of the United States and are open to the operation of the laws regulating homestead entry * * * and to entry under the town site laws and the laws governing the disposal of coal lands, desert lands, and mineral lands."

the Indians. There remains for decision the question as to the quantity to which the United States is entitled. The problem is one of great practical importance, and a priori theories ought not to stand in the way of a practical solution of it. The area of irrigable land included in the reservation is not necessarily the criterion for measuring the amount of water reserved, whether the standard be applied as of 1859 or as of the present. The extent to which the use of the stream might be necessary could only be demonstrated by experience.

As appears from the finding summarized in footnote 9, about 1,900 acres were in cultivation as early as 1886. At the time of the trial the cultivated area had not substantially increased. According to the allegations of the bill the amount of land then irrigated was about 2,000 acres. The number of Indians living on the reservation has never been large. In 1866 there was a population of about 600, and about 800 in 1875. There are now living there approximately 500 Indians. 96 individual Indians are farming parts of 140 allotments of 20 acres each and 96 allotments have homes on them.

The report of the master states that "the number of Indians is not increasing and it has not been shown that there is the necessity or demand for the cultivation of a larger area than 2100 acres." For the purpose of irrigating that quantity of land the master was of the opinion that 26.25 second feet of water, measured at the point of diversion, is sufficient. While the latter estimate is somewhat out of line with what was determined to be the duty of water on other parts of the stream, the Government has not questioned the estimate, but rather seems to approve of the master's proposed finding so far as it went. We are constrained to accept this estimate as a fair measure of the needs of the Government as demonstrated by seventy years' experience.

Appellant's counsel suggest a decree limiting the quantity of water for reservation purposes to the amount, not exceeding 150 second feet, which the Government may demand from year to year at the commencement of the season. That a decree of this sort would tend greatly to depreciate the value of the water rights of the upstream owners, and to make impossible any intelligent program of farming, is obvious. So precious is every miner's inch of water in these parched regions that no arrangement should be countenanced which would encourage waste or tend to induce it.

The decree is reversed with directions to enter a decree adjudging the United States to be entitled to the continuous flow of 26.25 cubic feet of water per second, to be diverted from Walker River upon or above Walker River Indian Reservation during the irrigation season of one hundred and eighty days for the irrigation of two thousand one hundred acres of land on the reservation, and the flow of water reasonably necessary for domestic and stock watering purposes and for power purposes to the extent now used by the Government, during the non-irrigating season, with a priority of November 29, 1859, and enjoining the defendants from preventing or interfering with the natural flow of the described quantities of water in the channels of the stream and its tributaries to and upon the reservation.