The NORTHERN PAIUTE NATION
et al.

v.

The UNITED STATES.

No. 87–A.

United States Court of Claims.

Oct. 22, 1980.

I. S. Weissbrodt, Washington, D. C., attorney of record, for plaintiff; Weissbrodt & Weissbrodt, Washington, D. C., of counsel.

Glen R. Goodsell, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on motion of the plaintiff, Pyramid Lake Tribe of the Pyramid Lake Reservation, filed September 4, 1980, moving that the court adopt the recommended decision of Trial Judge Thomas J. Lydon, filed August 4, 1980, pursuant to Rule 134(h), as the basis for its judgment in this case since the parties have filed no notice of intention to except or exceptions thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby grants plaintiff's motion and affirms and adopts the decision as the basis for its judgment as to this plaintiff in this case. Accordingly, it is concluded that this plaintiff is entitled to recover under Count VIII of the petition and judgment is entered for it with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

The plaintiffs in this case are the Northern Paiute Nation, and six present–day Indian tribes, including the Pyramid Lake Tribe. The amended and supplemental petition in this case, which originally was filed with the Indian Claims Commission and thereafter transferred to this court in March 1978, pursuant to Pub.L.No. 94–465, 90 Stat. 1990, 25 U.S.C. § 70v (1976), contains ten counts. The present matter before the court only involves Count VIII which sets forth one of the claims of the Pyramid Lake Indian Tribe (hereinafter plaintiff).[1]

In Count VIII, plaintiff alleges that by Executive order, issued April 28, 1864, President Abraham Lincoln set aside a tract of land, designated a timber reserve, as an adjunct to, and for the purpose of supplying lumber for the Indians of the Pyramid Lake Indian Reservation. Subsequently, by Executive order issued July 15, 1868, President Andrew Johnson directed that this timber reserve be abandoned and the tract restored to the public lands. Plaintiff claims entitlement to the value of this timber reserve tract of land as of July 15, 1868, the date on which it was returned to the public lands without payment of any compensation to the Pyramid Lake Indian Tribe.[2]

Plaintiff's claim is founded on section 2 of the Indian Claims Commission Act, 60 Stat. 1050, 25 U.S.C. § 70a (1976) which provides that the Commission shall hear and determine "* * * (1) claims in law or equity arising under * * * Executive orders of the President; * * *; and (5)

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Each count sets forth a separate and independent cause of action, and is, in essence, a case unto itself. Counsel and the trial judge agreed that a series of proceedings, e. g., trial on some counts, motion proceedings on other counts, stipulated records on still other counts, and settlement discussions on other counts contingent on pending cases awaiting decision, would most probably conclude the total litigation more simply and speedily than preparation for one single proceeding encompassing all ten counts in issue. See The Navajo Tribe of Indians v. United States, Ct.Cl., 624 F.2d 981 at 985, 1980. By order entered November 3, 1978, the court granted defendant's motion for summary judgment and dismissed Count II of the amended and supplemental petition. Count VIII is being presented to the court on a joint stipulation of facts and agreed–upon documentation. The parties advised that neither intended to call any witnesses relative to this count.

2. The Pyramid Lake Tribe of the Pyramid Lake Reservation, is a tribal organization formed under the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 988, 25 U.S.C. §§ 476, 477, and has been recognized by the Secretary of the Interior as having authority to represent its enrolled members. It is the successor in interest to an aboriginal group of Northern Paiute Indians, who took up residence on the Pyramid Lake Reservation following the setting apart of that reservation by action of the Department of the Interior in 1859, and whose descendants are members of the present–day organized tribe, the Pyramid Lake Tribe of the Pyramid Lake Reservation, Nevada.

claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. * * *" The issues, as presented by the parties, are: (1) was a compensable interest in the timber reserve conferred on plaintiff by the 1864 Executive order; and (2) was this interest in the timber reserve subsequently abandoned by plaintiff so as to render the restoration of the timber reserve to the public domain by the 1868 Executive order a noncompensatory event. Only the question of liability is presently before the court, the matter of quantum having been reserved for subsequent proceedings, if such are necessary.

## I.

The aboriginal lands of the Northern Paiute Nation were located in the northwestern section of the United States. The United States did not enter into any treaties with the Indians of the Northern Paiute Nation for the cession of, or the extinguishment of, the title to their lands. *See United States v. Northern Paiute Nations*, 183 Ct.Cl. 321, 393 F.2d 786 (1968). Instead, tracts of land within the Northern Paiute Indian territory were selected by the Department of Interior (DOI) as Reservations for various tribal entities, and the federal government thereafter pursued a course of action to induce the Indians to move and settle upon these selected reservations. In 1859, one tract of land selected and set aside by DOI for a reservation was located in the valley of the Truckee River, which tract included Pyramid Lake. *See* 1 Kapler 868 (2d ed. 1904). This Reservation became known as the Pyramid Lake (or Truckee) Indian Reservation. *See Northern Paiute Nation v. United States*, 27 Ind.Cl.Comm. 39 (1972).[3]

**3.** The area in which this reservation was located was included in the Territory of Utah, which was established by the Act of September 9, 1850, 9 Stat. 453. Later the Territory of Nevada was established by the Act of March 2, 1861, 12 Stat. 209, and all Northern Paiute aboriginal lands earlier within the Territory of Utah were thereafter within the Territory of Nevada. Section 1 of the Act of March 2, 1861, provided, in pertinent part:

The Pyramid Lake Indian Reservation was somewhat triangular in shape and its greatest length was some 53 miles and its greatest width was some 25 miles. The record suggests that Pyramid Lake itself occupied a large portion of this Reservation. While the record does not clearly indicate how many Indians were located on the Pyramid Lake Reservation itself, there is some evidence that some 6,000 "Pah–Utes" were located in the Nevada Territory in the 1860's. It was reported that the wealth of these "Pah–Utes" at that time consisted of a few ponies.

After the establishment of the Pyramid Lake Indian Reservation, the federal government made efforts to have the Indians settle peaceably thereon. However, friction between Indians and emigrants, settlers and prospectors developed and hostilities ensued. Recommendations to conclude treaties with the Indians as a solution beneficial to all concerned were not adopted. Beginning in 1860, efforts were made to bring an end to hostilities. To this end, the federal government agreed to protect the Reservation from emigrant, settler and prospector encroachment and to teach the Indians located thereon how to provide for themselves and adapt to reservation life.

The Governor of the Territory of Nevada and Ex–officio Superintendent of Indian Affairs for the Nevada Territory, James W. Nye (Nye), believed that it was in the best interests of the federal government as well as the Indians that the government assist the Indians on the Pyramid Lake Reservation by furnishing them with implements and livestock, and by training them, so that they could engage in productive pursuits. Governor Nye hoped to improve the Reservation so that the Indians thereon would be able to support themselves adequately and

"* * * That nothing in this act contained shall be construed to impair the rights of persons or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians. * * *" (12 Stat. at 210.)

establish permanent homes thereon. He felt that if the Pyramid Lake Reservation Indians were assisted by the government in becoming self–sufficient, they would not require further financial assistance from the government. Governor Nye's views reflect a later demonstrated firm federal policy of promoting tribal self–sufficiency and economic development. *See White Mountain Apache Tribe v. Bracker*, —— U.S. —— at ——, 100 S.Ct. 2578 at 2585, 65 L.Ed.2d 665 (1980).

Governor Nye's plan for developing the Pyramid Lake Indian Reservation, which was approved by the Secretary of the Interior, was (1) the furnishing to the Indians of livestock to produce meat, brood mares to raise horses, and implements and seed to engage in farming; (2) the selection and setting aside of a tract of forested land located outside the Reservation, as a timber reserve, in order to provide timber to the Reservation for use in constructing houses and other structures and facilities for the Indians, including the fencing of their fields and for other purposes; and (3) the erection of a sawmill on the Reservation to process the timber into lumber, and the construction of a dam and the digging of an irrigating canal in connection with the mill. Governor Nye advised the Secretary of Interior that if the Pyramid Lake Indian Reservation was to improve, the Reservation must have lumber and timber to do it, with the lumber necessary for buildings and fences.

Governor Nye, in November 1863, engaged a contractor to construct the sawmill with an agreement that the mill would be in running order by June 1864. A survey of the proposed timber reserve, which was located in an area of the Sierra Nevada mountains, was completed in November 1863, with the field notes and Plat of Survey certified in December 1863. The timber reserve tract, consisting of 20,531.38 acres, was located on the Truckee River, in Washoe County, Territory of Nevada. It was about 60 miles southwest of the Pyramid Lake Indian Reservation. The logs cut on the timber reserve were to be floated down the Truckee River to the sawmill on the Reservation. The only timber accessi-

ble to the Pyramid Lake Indian Reservation was on the Sierra Nevada mountains. Governor Nye entered into another contract in November 1863, for the cutting of logs on the timber reserve and their delivery to the sawmill by June 1864.

On February 26, 1864, Governor Nye forwarded his plans for the sawmill and the timber reserve to the Secretary of Interior. He advised the Secretary that he had "no doubt" that these improvements to the Pyramid Lake Reservation "will realize all the advantages to the Indians" anticipated by the Secretary; and that the Indians "are delighted" with the prospect of these improvements. The Acting Commissioner of Indian Affairs thereafter recommended that the President direct that the tract of land selected and surveyed for the timber reserve be excepted for the public survey. On April 28, 1864, President Lincoln accepted this recommendation by signing an order which read: "Let the Reservation be excepted from public survey." By this order, Royce noted, a timber reserve on the Truckee River was established for the use of the Pyramid Lake Reservation Indians.

On July 13, 1864, the Secretary of Interior directed the Commissioner of Indian Affairs that timber on the timber reserve "must be preserved from waste and depredations; and so far as it is cut and removed must be applied directly to the erection of the improvements required for Indians and is not to be sold or exchanged for the benefit of the Indians indirectly." The Secretary also cautioned that "[t]he Pacific railroad will probably pass along in the vicinity of the reserve, and the railroad company may eventually claim rights in the land, should it not be required for Indian use perpetually."

Because of unusual drought conditions during the winter–spring of 1863–1864, there was not a sufficient supply of water in the Truckee River. This situation delayed the construction of the sawmill for the year 1864, a fact reported to the Secretary of Interior by the Commissioner of Indian Affairs on November 15, 1864. On

February 22, 1865, Governor Nye informed the Secretary of Interior that there was a prospect of having a good supply of water in the Truckee River and that he would recommend that an order be issued for putting up the mill forthwith. In March 1865, while in Washington, D. C., Governor Nye learned that the line of the Pacific Railroad would run near or through the site of the sawmill on the Pyramid Lake Indian Reservation. Since he was of the opinion it would be detrimental to the interest of the government to build the mill in the place originally selected, he recommended that the mill site and property, together with related privileges be sold to some responsible person. Such a recommendation was never approved. On November 30, 1865, the Superintendent of Indian Affairs for the Nevada area, H. G. Parker (Parker) advised the Commissioner of Indian Affairs, in response to his inquiry as to how the sawmill construction work was progressing, that no work on the sawmill was being done and he had not been informed why the work was suspended.[4] Parker further advised that no part of a super–structure, or any machinery whatever for a sawmill was on the mill–site ground.[5]

Pursuant to Governor Nye's contract of November 1863, timber was cut on the timber reserve and some 1.5 million feet of logs had been banked on the river's edge for flotation down the Truckee River to the sawmill located on the Pyramid Lake Indian Reservation. The drought situation precluded any such delivery of logs in 1864.

However, in the spring of 1865, the logging contractors were prepared to run the logs down the river but as there was no sawmill constructed on the Reservation at that time they were instructed by an agent of Governor Nye not to do so. It would appear from the record that in late 1865 or early 1866, the greater portion of the logs cut and banked near the river were burned as were a great many more logs that had been cut but had not been hauled to the river bank.

In a report dated October 22, 1866, to the Secretary of Interior, the Commissioner of Indian Affairs noted that "[t]here are three reservations in Nevada, in the Pi–Ute country, one including Pyramid lake, another Walker lake, and a third set apart for timber for the first–named reserve." The Secretary was advised that as to the timber reserve, "which includes about 20,000 acres of fine timber," the Pacific Railroad would probably lay claim to alternate sections of said timber reserve, and while this claim was of doubtful validity, it was recommended that since the timber has been found very difficult to protect, it be sold and the proceeds used for the Indians of the state.[6] The Secretary was further advised that a beginning has been made on these Indian Reservations in cultivating the soil, but that agricultural operations in Nevada require irrigation for their permanent success and that "nothing can be done which shall tend to concentrate these Indians to the pursuit of self–sustaining industry until the means are provided for that purpose."

4. H. G. Parker (Parker) did not enter on his duties as Superintendent of Indian Affairs for Nevada until September 1865. The last annual report on the state of Indian Affairs in Nevada which the Commissioner of Indian Affairs had received from the Governor of the Territory of Nevada and Ex–officio Superintendent of Indian Affairs for the Nevada Territory, James W. Nye (Nye) was dated September 30, 1864. Nevada was admitted into the Union as a state on October 31, 1864, and Nye became one of its United States Senators. For some period of time between November 1864 and September 1865, no person was available in Nevada to attend to Indian Affairs.

5. In a letter dated September 20, 1864, to the Secretary of Interior, Governor Nye had advised, with respect to the sawmill, that the water–wheel and machinery already constructed and on hand have been safely housed and ready to be put together immediately on getting a sufficient supply of water in the river to set the mill at work.

6. The record does not indicate that this recommendation was approved. Parker, thereafter forwarded a contract dated December 4, 1866, for approval, and an offer, under date of December 5, 1867, for acceptance allowing logging by third parties of the timber on the Indian timber reserve, with the proceeds of such timber sales, if approved, to be used for the benefit of the Indians. There is no evidence in the record that this contract was ever approved or the offer accepted.

Following the establishment of the timber reserve for the use and benefit of the Pyramid Lake Indian Reservation, settlers complained to the Secretary of Interior that such action interfered with their good faith efforts and intentions of homesteading and preempting portions of said timber reserve land by their occupation thereof.

On March 1, 1867, the legislature of the State of Nevada passed a Resolution stating that the timber reserve in question had been set apart for the use and benefit of the Indians and that the "tract has not been, and is not now used as such timber reserve, and because of location and character, can never be of any value to said Indians." The Resolution, after noting that "but a small portion of the public lands of this State, subject to location as school lands, are of any marketable value," instructed the state's Senators "to use all honorable means to secure the passage of an Act of Congress permitting the State of Nevada to select and locate said land [the timber reserve] as a portion" of 500,000 acres of land previously granted by Act of Congress on September 4, 1841, said grant being, by Act of Congress on July 4, 1866, devoted to educational purposes.

On April 25, 1867, the two United States Senators from Nevada, William M. Stewart and James W. Nye, directed a letter to the Secretary of Interior, enclosing the March 1, 1867, Resolution of the Nevada legislature, recommending that the timber reserve be deemed abandoned and therefore designated and treated as public lands and open to preemption and settlement. On May 15, 1867, the Commissioner of Indian Affairs forwarded the April 25, 1867, letter from the Nevada Senators to the Secretary of Interior for his consideration and decision.[7] The Commissioner made no recommendation as to whether the timber reserve should be abandoned, begging "leave to refer the case to the Department for decision * * *."

On May 23, 1868, the Superintendent of Public Instruction for the State of Nevada, A. N. Fisher (Fisher), wrote Senator Stewart advising he had been commissioned by the state's Board of Regents to visit Washington, D. C. for the purpose or urging legislation which would enable the state to select all or part of the timber reserve in issue in part satisfaction of any one of several grants of land made by the United States to the State of Nevada in the interest of the educational fund of the state. Fisher wrote Senator Stewart that a "projected canal & saw mill scheme which occasioned the reservation has been abandoned as wholly impracticable. The tract is covered with timber & being situated along the base & on the slope of the Sierra Nevada range is only of value as timberland & as such can never be of any use to a race which cannot be persuaded in live in houses." Fisher also advised that heavy snows rendered a portion of the tract uninhabitable during perhaps 8 months of the year. Fisher's plan, as outlined in his letter to Senator Stewart, ostensibly was, if the timber reserve tract was granted to it by the United States, to sell the tract, or portions thereof, to "bona fide occupants and settlers," with the proceeds of said sales going to the state's educational fund. Senator Stewart sent Fisher's letter to Commissioner Wilson of the General Land Office, DOI. In his transmittal letter, Senator Stewart "earnestly" recommended that the timber reserve be abandoned stating: " * * * It has never been used. There is not an Indian on it & never will be."

Commissioner Wilson, on June 16, 1868, sent Senator Stewart's letter along with Fisher's letter to the Commissioner of Indian Affairs. In his transmittal letter, Commissioner Wilson noted that in accordance with the 1864 Executive order, the timber reserve was excepted from the public surveys and the inceptive rights of numerous

7. In his letter to the Secretary, the Commissioner noted that Superintendent Parker suggested that the reserve was not needed for the Indians when he recommended approval of a contract to log the timber reserve with the proceeds therefrom to be used for the Indians' benefit (see note 6, supra). The Commissioner advised the Secretary he would have approved the contract but for the letter from the Nevada Senators.

settlers had to be disregarded in promoting the "supposed important interests of the Indians at the time the reservation was made * * *." He further advised that no interference took place on the timber reserve lands until August 1865 when subdivisional surveys, on the request of the Central Pacific Railroad Co. of California, were made with the approval of DOI which showed that the timber reserve, or parts of it, fell within the ambit of proposed railroad expansion. Commissioner Wilson advised that the railroad was suggesting a right to odd numbered sections of the timber reserve under a grant of July 1, 1862, which preceded the date of the 1864 Executive order. Commissioner Wilson offered no recommendation as to whether the timber reserve should be abandoned.

On June 30, 1868, the Commissioner of Indian Affairs, N. G. Taylor (Taylor) sent Commissioner Wilson's letter, together with the letters of Senator Stewart and Fisher, to the Secretary of Interior. In his transmittal letter, Taylor reviewed the timber reserve situation noting that Superintendent Parker had advised of the difficulty of protecting the timber on the timber reservation, that said land was not adapted to the purposes of agriculture and that the Indians seldom pass over it; and that he (Parker) recommended that the timber reservation be sold to the best advantage and the proceeds applied to the common benefit of all the Indian tribes. Taylor also quoted from a March 24, 1868, report from Parker wherein Parker counseled against abandonment of the reservation as not being in the best financial interests of the government and recommended that he be allowed to sell the timber on the reservation for $2.50 per acre.

By letter dated July 14, 1868, the Secretary of the Interior sent to President Johnson, the June 30 letter from Taylor, with accompanying papers, recommending that the President direct the abandonment of the timber reservation, which was reserved in 1864 "for Indian Purposes," and restore it to the mass of public lands, on the

ground, "the reservation is no longer required for the purposes reserved." On July 15, 1868, President Johnson endorsed the Secretary's July 14 letter as follows: "Let the within named Indian Reservation be abandoned as recommended by the Secretary of the Interior."

On January 15, 1873, the Commissioner of the General Land Office, DOI, Willis Drummond (Drummond), denied a claim by the Central Pacific Railroad Co. based on the contention that title to the odd–numbered sections of townships located within the timber reservation had vested in said company prior to the 1864 Executive order establishing the Reservation. In his decisional letter, Drummond stated in pertinent part:

It is clear to my mind that the land was set apart as a Mill and Timber Reservation for Indian purposes and no others. It is equally clear that it was such a reservation as might be used for that purpose temporarily or perpetually as might be required by the Government * * *.

On June 3, 1874, the Secretary of Interior affirmed Drummond's decision noting in pertinent part:

The lands in question were covered by the said reserve at the date of definite locations of the line of route by the company. Under the well settled rule of the Department they were protected against the grant to the Company and on the subsequent removal of the reservation reverted to the mass of the public land, subject to general disposal under appropriate laws, such as selection by the State.

\* \* \* \* \* \*

## II.

Executive orders have been used extensively in Indian affairs. They have been used to create Indian reservations and property interests and they have been used to modify, enlarge, restrict or extinguish existing Indian reservations and property interests.[8] It is settled that the President

---

8. *See e. g.*, Kappler, Indian Affairs: Laws and Treaties, 801–936 (2d ed. 1904) (Kappler).

Within the five–volume work of Kappler can be found almost all Executive orders relating to

had the authority to withdraw public lands and set them apart for the benefit of Indians. *United States v. Midwest Oil Co.*, 236 U.S. 459, 469–75, 35 S.Ct. 309, 311–13, 59 L.Ed. 673 (1915); *see also Arizona v. California*, 373 U.S. 546, 598, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963).

It was also settled, prior to the enactment of the Indian Claims Commission Act on August 13, 1946, *supra*, that no compensation was due Indians when the President by Executive order subsequently took land, previously set aside by Executive order as a reservation for the benefit of Indians, and returned said land to the public domain without any payment of compensation to the Indians. *Ute Indians v. United States*, 330 U.S. 169, 176, 67 S.Ct. 650, 653, 91 L.Ed. 823 (1947); *Sioux Tribe v. United States*, 316 U.S. 317, 331, 62 S.Ct. 1095, 1101, 86 L.Ed. 1501 (1942); but see note, *Tribal Property Interests in Executive–Order Reservations: A Compensable Indian Right*, 69 Yale L.J. 627 (1960).

Plaintiff concedes that prior to the passage of the Indian Claims Act, *supra*, it had no compensable claim against defendant for termination of the timber reservation by the 1868 Executive order. However, it argues that under subsections (1) (claim in law or equity arising under Executive orders) and (5) (claim based upon fair and honorable dealings) of section 2 of said Act plaintiff does have a compensable claim resulting from the issuance of the 1868 Executive order.

It now seems fairly well established that claims under the Indian Claims Commission Act, *supra*, for the taking of Indian reservation land established by Executive order may be compensable. *Three Tribes of Fort Berthold Reservation v. United States*, 182 Ct.Cl. 543, 561–63, 390 F.2d 686, 696–97 (1968); *Confederated Tribes of the Colville Reservation v. United States*, 25 Ind.Cl. Comm. 99, 113 (1971); *see also Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103 n. 22, 69 S.Ct. 968, 979 n. 22, 93 L.Ed. 1231 (1949).

--A--

Plaintiff contends that it had a compensable interest in the timber reservation set aside for its use and benefit by the 1864 Executive order, relying on the decisions in the *Fort Berthold* and *Confederated Tribes* cases cited above. Defendant, recognizing the impact of those holdings on the issue at hand, seeks to distinguish those cases from the instant case.

In *Fort Berthold*, an Executive order added a tract of land to an existing Indian reservation.[9] Subsequently, this tract of land was taken from the Indians by Presidential proclamation and opened to entry and settlement under the homestead laws. This court, reversing the Indian Claims Commission, held that the Indians obtained a compensable interest in the tract conveyed to them by Executive order. In *Confederated Tribes*, the Indian Claims Commission, relying on the *Fort Berthold* decision, held that the Joseph Band of Indians acquired a compensable interest in reservation lands established by an 1873 Executive order, which lands were subsequently returned to the public domain by an 1875 Executive order.[10]

---

Indian affairs up to 1939. For some unexplained reason, it would appear that the 1864 and 1868 Executive orders in issue are not recorded in Kappler.

**9.** This Executive order, issued on June 17, 1892, directed that certain described land (a small area known as Royce Area 716) "be, and the same is hereby withdrawn from sale and settlement and added to the Fort Berthold Indian Reservation." 1 Kappler 883. There is no available evidence as to the purpose of this Executive order nor is there any evidence of

the use, if any, the Indians made of Royce Area 716 before it was taken from them.

**10.** By Executive order dated June 16, 1873, a reservation was established for the "roaming Nez Perce Indians." 1 Kappler 894. In the face of political pressure, President Grant, by Executive order dated June 10, 1875, revoked his prior order and restored the lands upon the reservation to the public domain. 1 Kappler 895. There is evidence that the Indians occupied the reservation lands during the two winters of its existence and occupied some portion of these lands in the summer.

Defendant argues that the 1864 Executive order in issue did not create an Indian reservation within the context of the *Fort Berthold* and *Confederated Tribes* holdings. Defendant suggests that the timber reservation was intended to be merely a temporary adjunct to the Pyramid Lake Reservation and was created merely to serve, for a limited time, as a timber source for that reservation.[11] Thus, defendant suggests that the 1864 Executive order land really was not an Indian reservation at all. It was, in defendant's view, merely a tract of land on which Indians were permitted to go and cut timber.

Defendant's restrictive reading of the 1864 Executive order, and related documentation, is not supported by the record. The record shows that the timber reservation, which was surveyed and clearly identified, was held out to all as being land set aside for the use and benefit of the Indians. It was, as a result of the 1864 Executive order, recognized as Indian land by settlers, miners, emigrants, the territory, and later the state, of Nevada, and officials of the federal government. Railroad claims, as well as the claims of others, to this land were deemed subordinate to those of the Indians. This timber reservation was truly "Indian Country." *See United State v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938); *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914). Under the 1864 Executive order, the Indians clearly had a viable interest in

the timber reservation which included the land and the timber standing thereon.

The thrust of defendant's position seems to be that there can be no compensable interest in an Executive order reservation unless the order, directly or indirectly, establishes the land as a home or an abode for Indians and said land is thereafter occupied as such.[12] Defendant notes that the Executive order land in *Fort Berthold* was added to an existing reservation which then served as a home and abode for Indians. Defendant assumes that the *Fort Berthold* Executive order land also served as a home and abode for the Indians, but there was no evidence that this was so. How this land that was added to the existing reservation was used was not disclosed. Likewise, in *Confederated Tribes,* defendant notes, the Executive order established a reservation for use as a home and abode for Indians and it was thereafter occupied as such. Defendant reads into these cases a holding never enunciated by the court or the Commission. In neither of these two cases was there any emphasis on the stated purpose of the Executive orders, or any hint that a reservation created by Executive order must be used as a home or an abode in order for a compensable interest to be created in the Indians.[13]

In furtherance of its position, and as a basis for distinguishing the *Fort Berthold* and *Confederated Tribes* holdings, defendant stresses that it has not been shown, nor can it be implied that the timber reserva-

**11.** This suggestion seems a little one–sided. In 1873, the Commissioner of General Land Office, Department of Interior observed that the timber reservation was set apart for Indian purposes and for no other purposes and that it was clear "that it was such a reservation as might be used for that purpose temporarily or perpetually as might be required by the Government."

**12.** *Healing v. Jones,* 210 F.Supp. 125, 144 (D.C. Ariz.), *aff'd* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963), cited by defendant, does not support such a broad proposition. In the *Healing* case, the District Court, in resolving conflicting claims of two Indian tribes to the same land, had to determine each tribe's use and occupancy of the disputed land and whether such use and occupancy constituted settle-

ment of the land within the meaning of the statute in issue in that case. Further, plaintiff's claim herein does not rest on aboriginal title ("Indian Title") where use and occupancy are critical factors. *See Crow Tribe of Indians v. United States,* 151 Ct.Cl. 281, 284, 284 F.2d 361, 363 (1960), *cert. denied,* 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961).

**13.** It is noted that some Executive orders designated land for the *use* of Indians whereas others designate land for the *use* and occupancy of Indians. *See* F. Cohen, Handbook of Federal Indian Law, 300 (1940). This suggests that if occupancy was the intendment of the 1864 Executive order it probably would have been so stated.

tion was to serve as an abode and home for the Indians; that the Indians did not intend to live on it since they rarely went on the timber reservation land during the 4 years of its existence; and that the timber reservation had no value to the Indians because of its location. None of these contentions detract from the fact that the 1864 Executive order set aside the timber reservation for the use and benefit of the Indians and thus conveyed, under the circumstances of record, a compensable interest in the Indians to the lands covered by the order.

It was noted, after the Pyramid Lake Indian Reservation was established, that no timber was available to the Indians on the Reservation. To remedy this situation, and to have these nomadic and uncivilized people become pastoral and civilized, the timber reservation was established as the most available site which could provide timber to them. It seems clear that the 1864 Executive order did not contemplate that the Indians would build homes on and occupy the timber reservation as an abode. That was not the purpose of the Executive order. Moreover, the record suggests that the timber reservation was ill–suited at that time for any such large–scale use and occupancy. It is clear that the timber reservation was to supply a missing need to the Pyramid Lake Reservation in order to enable the Indians living thereon to construct homes and abodes, structures to hold their crops and fences to control their livestock. In a real sense it would not be unreasonable to consider the timber reservation, even though some 60 miles away, an integral part of the expected life and development of the Reservation.

The timber reservation was only suited for timber production at that time. The record indicates it was not adapted for purposes of agriculture and that heavy snows on the slopes of the Sierra Nevada mountains rendered a portion of the timber reservation uninhabitable during perhaps 8 months of the year. Since the Indians had their own home and abode on the Pyramid Lake Reservation, and government policy encouraged these nomads to remain on that Reservation, it is not surprising that few Indians went to the timber reservation during the limited time the timber reservation existed. This fact, under the existing circumstances, is of little significance.

Defendant also maintains that the timber reservation had no value to the Indians because it was some 60 miles from the Reservation on the slopes of the Sierra Nevada mountains. However, it seems it had value to others who sought to purchase it, especially the State of Nevada which sought the timber reservation as a grant from the federal government so it could thereafter sell the land and its valuable timber, and put the proceeds in its educational fund. It is concluded that the timber reservation did have value to plaintiff if the government controlled and managed the timber reservation of its Indian ward in good faith for their welfare and did not thereafter hand over this land to others. *See United States v. Klamath and Moadoc Tribes of Indians*, 304 U.S. 119, 123, 58 S.Ct. 799, 801, 82 L.Ed. 1219 (1938).

If, as defendant contends, the primary intent of the 1864 Executive order was only to provide timber for the Indians on a temporary basis, it would not have been necessary to survey and set aside the land by Executive order. Instead, the government could have hired loggers and contractors to cut and deliver the timber to the reservation from public lands which were under the control of the government. Clearly, more was intended by the 1864 Executive order for the use and benefit of the Indians than the mere temporary right to obtain timber from the reserved land. Defendant seems to agree that plaintiff had a right to the timber under the 1864 Executive order, but argues plaintiff had no interest in the land itself. However, the interest of the plaintiff attributable to the timber was a part of the interest of plaintiff to the land on which the timber was standing. *See United States v. Klamath and Moadoc Tribes of Indians, supra*, 304 U.S. at 123, 58 S.Ct. at 801; *see also United States v. Algoma Lumber Co.*, 305 U.S. 415, 420–21, 59 S.Ct. 267, 270, 83 L.Ed. 260 (1939).

The 1864 Executive order setting aside the timber reservation for the use and benefit of plaintiff was most cryptic. It simply read: "Let the Reservation be excepted from public survey." [14] The order issued might be more properly viewed as Executive approval rather than an Executive order since the President's cryptic notation and signature was affixed to the recommendation document submitted by the Department of Interior. However, this type of Executive approval, if it be viewed as such, is of equal validity to an Executive order. *See* F. Cohen, Handbook of Federal Indian Law, 302 (1940). When public land is set aside as a reservation for Indians without any further language indicating that the action is a mere temporary expedient, such land should properly thereafter be recognized as an Indian reservation in every sense these words generally convey.

■ Documents setting aside land for the use and benefit of Indians have uniformly been given a liberal interpretation favorable to the Indians. *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 59 L.Ed. 941 (1912); *United States v. Walker River Irr. Dist.*, 104 F.2d 334, 337–38 (9th Cir. 1939). Application of this rule, to the circumstances of this case, adds to the strength of a holding that a compensable interest in the timber reservation was conveyed to plaintiff by the 1864 Executive order. Whatever conflicting implications or inferences may exist in this record as to the status of the timber reservation when it was established by the 1864 Executive order, that which makes for a finding that the timber reservation (land and timber) was set aside for the use of the Indians so as to create in them a compensable interest in said lands, is of greater force than any implication or inference that all the order conveyed to the Indians, as suggested by defendant, was a temporary right to go upon and cut timber

on the timber reservation lands. *See Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). Any doubts as to the scope of the interest conferred on plaintiff by the 1864 Executive order are to be resolved in favor of the Indian wards as against the guardian United States. *See United States v. Shoshone Tribe*, 304 U.S. 111, 117, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938).

In determining the character and nature of the Indian interest in land created as a reservation, the circumstances surrounding the creation of that reservation, especially where the Executive order language is cryptic, should not be disregarded. The totality of the circumstances surrounding the creation of the timber reservation in 1864 clearly show that it was created to meet the timber needs of the Pyramid Lake Indian Reservation with the objectives of keeping the Indians on this Reservation, making them self–sufficient, and providing them with the materials to become civilized. This purpose and these objectives are clearly compatible with the conclusion that the 1864 Executive order conveyed to plaintiff a compensable interest in the timber reservation. *See United States v. Walker River Irr. Dist., supra*, 104 F.2d at 336.

–B–

Defendant maintains that the timber reservation was created for the limited purpose of supplying timber to the plaintiff's Reservation and that once that limited need was served, the timber reservation could be returned to the public domain without the payment of any compensation to plaintiff. Defendant stresses that the reason the timber reservation was "abandoned" by the 1868 Executive order was because it was no longer needed to supply timber to the Indians. Defendant's contentions are based on

---

14. Executive orders withdrawing lands from the public domain for Indian purposes were by no means uniform. *See* IV Kappler, 1063–64; *see also* F. Cohen, Handbook of Federal Indian Law, 300–01 (1940). If, as defendant contends, the Executive order was intended to convey only a right of the Indians to cut timber on the reservation for a limited period, *i. e.*, as long as they needed it, and did not intend to convey any interest in the land on which the timber was located, it would not be unreasonable to have expected the Executive order to have so stated. *See id.* at 301.

a superficial assessment of the facts of record.[15]

The record suggests that the timber needs of the plaintiff were as great, if not greater, in 1868 as they were in 1864 when the timber reservation was created. In 1868, plaintiff ostensibly still needed timber to fence in their cattle, hold their crops and construct shelters, homes and other facilities, which needs underscored the establishment of the timber reservation in 1864. Defendant's assertion that these needs had been met by 1868 has no record support. Indeed, there is no evidence that a single log from the timber reservation made it to plaintiff's Reservation. It is important to consider the needs of the Indians during this period and the objectives sought to be attained by the 1864 Executive order. *United States v. Walker River Irr. Dist.,* supra, 104 F.2d at 336.

■ In establishing the timber reservation for the use and benefit of plaintiff, the United States, as a superior sovereign, was under a duty to the dependent Indians to do whatever it was required to do to meet the objectives behind the establishment of the timber reservation.[16] *Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, 493–94, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964).

■ In placing the Indians on the Pyramid Lake Reservation, and as an inducement for them to cease their nomadic and hostile ways, the federal government agreed to provide them with materials and assistance so that they could become self–sustaining and civilized. Governor Nye informed the Indian leaders of his plan for a sawmill and a timber reservation whereby lumber would be available for tribal development. He advised the Indians were "delighted" with his plan. It is not unreasonable to believe that the Indians understood that this plan was part of the *quid pro quo,* i. e., acceptance of reservation life in return for assistance in civilized and self–sufficiency development. *See Choctaw Nation v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). Under such circumstances, a special relationship was created by the 1864 Executive order, implementing this plan, between the federal government and the plaintiff. This special relationship and attendant governmental duty are sufficient to support a claim under the "fair and honorable dealings" provision, section 2, subsection (5), of the Indian Claims Commission Act. *See Gila River Community v. United States,* 190 Ct.Cl. 790, 794–801, 427 F.2d 1194, 1196–1200, *cert. de-*

---

**15.** Officials of the State of Nevada pushed for "abandonment" of the timber reservation for self–serving reasons. Neither the Commissioner of Indian Affairs nor the Commissioner of the General Land Office recommended abandonment of the timber reservation. Further, the Superintendent of Indian Affairs for Nevada counseled against abandonment of this reservation, suggesting instead that the reservation be sold and the proceeds used for the benefit of the Indians. The Secretary of Interior acceded to the wishes of the Nevada officials and recommended to President Grant the abandonment of the timber reservation on the ground it was no longer required for "Indian purposes." It is not unreasonable, on this record, to conclude that political pressure was the significant factor in the determination to abandon the timber reservation. *See Confederated Tribes of the Colville Reservation v. United States,* 25 Ind.Cl.Comm. 99, 101 (1971) n. 10, *supra,* where political pressure caused President Grant to restore Executive order Indian land to the public domain thus creating a compensable right in the Indians for the value of said land. *See also United States v. Sioux*

*Nation of Indians,* —— U.S. ——— at ———, 100 S.Ct. 2716 at 2726, 2727, 65 L.Ed.2d 844 (1980), where the court noted President Grant's "duplicity" relative to the government's obligations to the Sioux Nation.

**16.** Defendant ignores the facts that these Indians were nomadic and uncivilized hostiles and that efforts were made, and had to be made, to confine them to a reservation and adapt them to civilized ways. It was realized that these Indians needed help if they were to develop as a self–sustaining and civilized people. During these initial years of Reservation life one could not reasonably expect these Indians to be loggers with capabilities of converting timber into lumber without governmental help. Under such circumstances, defendant's carping that the timber was available to the Indians but they did not use it or take it flies in the face of objective reality. The weakness and helplessness of the Indians in such matters created a duty of assistance and protection in the federal government. *See United States v. Walker River Irr. Dist.,* 104 F.2d 334, 337 (9th Cir. 1939).

*nied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Plaintiff premises its entitlement to compensation on subsection (5), as well as on subsection (1) of that Act.

A sawmill was indispensable to the production of lumber. While the federal government made some effort to establish a sawmill on the Pyramid Lake Reservation, these efforts ceased some time in March 1865 when it was learned that the Pacific Railroad line was to run near or through the sawmill site. It is to be noted that the Indians labored in these endeavors by participating in the digging of the irrigation canal which was to run from the dam to be constructed in connection with the contemplated sawmill. Fair and honorable dealings would seem to dictate that this Indian interest and need should not have been subordinated to the interest of the railroad. At the very least, a new sawmill site should have been provided for before the old site was abandoned. By abandoning construction of the sawmill, the federal government left the plaintiff with no place to process reservation timber. Such a course of action, under the circumstances, does not constitute "fair and honorable dealings," for defendant rightly should be held to greater efforts in this regard. *See Oneida Tribe of Indians of Wisconsin v. United States, supra,* 165 Ct.Cl. at 498.

As to the timber reservation itself, the federal government made an initial effort to cut and deliver timber to the Pyramid Lake Reservation. Loggers were engaged to cut and deliver timber to the sawmill some 60 miles away by floating logs down the Truckee River to the Reservation. Timber was logged in 1864, and some 1.5 million board feet was cut and banked on the river. However, an unusual drought in 1864 precluded use of the Truckee River as a delivery artery and the lack of a sawmill caused the federal government to defer delivery of the timber to the Reservation in 1865 at a time when the logging contractors were prepared to do so.[17] No logs were ever delivered to the Reservation. *See* note 16, *supra.* Further, there is no evidence that the federal government made any effort, subsequent to 1865, to log the timber reservation for the use and benefit of the Indians.[18] On this record, it cannot be said that defendant did the minimum it should have done in managing and protecting the timber reservation in the best interests of the Indians during the years of its existence. *See Oneida Tribe of Indians of Wisconsin v. United States, supra,* 165 Ct.Cl. at 498–500.

While defendant contends that the Indians abandoned the timber reservation, it seems clear that it was the federal government that abandoned its duty and obligation to the Indians. In *Goltra v. United States,* 119 Ct.Cl. 217, 254, 96 F.Supp. 618, 625 (1951) it was stated: " * * * The legal concept of abandonment is not met without a showing that the article [or property] was given up with the idea that it should return to the public domain, or with no idea at all except that the owner was dispossessing

17. The record suggests that some 2.4 million board feet of logs were cut on the timber reservation of which 1.5 million had been banked on the river for delivery as of 1865. In late 1865, large quantities of these logs were reported in a state of rot and decay and ravaged by worms rendering said logs unfit for lumber. In late 1865 or early 1866, the greater portion of the logs cut and banked on the river were burned together with a great many more logs that had been cut but had not been hauled to the riverbank. There is no explanation in the record as to how these logs came to be burned.

18. In 1867, the Superintendent of Indian Affairs for Nevada, attempted unsuccessfully to contract for logging privileges on the timber reservation with the proceeds of such a contract to be used for the benefit of the Indians. An 1867 offer to buy timber on the timber reservation, with the proceeds of such a sale ostensibly to be used for the benefit of the Indians, was also not approved. The Superintendent's effort to sell the timber for the benefit of the Indians was motivated by his inability to protect the timber reservation from trespassers. It was noted that timber was very scarce in that part of the country and that large and valuable trees were cut for purposes of firewood leaving other portions of trees to rot on the ground. As to federal policies relative to tribal timber *see White Mountain Apache Tribe v. Bracker,* —— U.S. —— at —— n. 12, 100 S.Ct. 2578 at 2585 n. 12, 65 L.Ed.2d 665 (1980); *United States v. Mitchell,* 445 U.S. 535 at 545, 100 S.Ct. 1349 at 1355, 63 L.Ed.2d 607, 1980.

himself of it. * * * Abandonment must be made by the owner, without being pressed by any duty, necessity or utility to himself, but simply because he no longer desires to possess the thing. * * * " There is no evidence that the Indians were consulted or that they indicated in any meaningful way they no longer desired to possess the timber reservation. The evidence is clear, the Indians had no say in the matter.

It has not been shown that there was any intent or agreement, tacit or otherwise, on the part of the Pyramid Lake Indians to abandon the timber reservation. Moreover, abandonment by the Indians of a reservation set aside for their benefit and use should not be even lightly implied in view of the avowed solicitude of the federal government for the welfare of the Indians. *See United States v. Santa Fe Pacific R. R. Co.,* 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941). Abandonment, under the facts of this case, can hardly be considered applicable to an uncivilized and dependent people. *See Kiowa, Comanche and Apache Tribes v. United States,* 143 Ct.Cl. 534, 541, 163 F.Supp. 603, 608 (1958).

—C—

It is concluded that, under section 2, subsection (1) of the Indian Claims Commission Act, *supra,* the April 28, 1864, Executive order created a compensable interest in plaintiff in the timber reservation. It is not deemed proper to permit the federal government, under the circumstances of this case, to appropriate the plaintiff's interest in this timber reservation by means of the July 15, 1868, Executive order and hand it over to another without the payment to plaintiff of compensation therefor. *See United States v. Klamath and Moadoc Tribes, supra,* 304 U.S. at 123, 58 S.Ct. at 801.[19] It is further concluded that, under section 2, subsection (5) of the Act, the federal government is liable to plaintiff for failure to treat fairly and honorably with the timber reservation. The amount of compensation due plaintiff will be the subject of further proceedings under Rule 131(c).[20]

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff, the Pyramid Lake Indian Tribe, is entitled to recover under Count VIII of the petition and judgment is entered to that effect. The amount of recovery will be determined in further proceedings pursuant to Rule 131(c).

**19.** Subsequent to the issuance of the 1868 Executive order returning the timber reservation to the public domain, the record indicates that this reservation land, in whole or in part, was granted by Congress to the State of Nevada.

**20.** Plaintiff is entitled to recover the fair market value of the timber reservation as of July 15, 1868, plus the fair market value of the timber cut but not delivered to the Pyramid Lake Reservation prior to said date. Since the claim relating to the timber reservation (Count VIII of the petition) is not grounded on a taking under the fifth amendment to the Constitution, plaintiff is not entitled to recover interest on the compensation due it as a result of the

decision herein. *See Tee–Hit–Ton Indians v. United States,* 348 U.S. 272, 277–85, 75 S.Ct. 313, 316–20, 99 L.Ed. 314 (1955); *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *Three Tribes of Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 570, 390 F.2d 686, 701 (1968); *see* D. Getches, D. Rosenfelt, C. Wilkinson, Federal Indian Law, 156, 549 (1979); Wilkinson, *Indian Tribal Claims Before the Court of Claims,* 55 Geo.L.J. 511, 524–28 (1966); *see also* H. M. Friedman, *Interest on Indian Claims; Judicial Protection of the Fisc,* 5 Val.U.L.Rev. 26, 38–39 (1970).